# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 2, 2021        Decided February 23, 2021

No. 20-1152

NATIONAL HOT ROD ASSOCIATION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL ALLIANCE OF THEATRICAL STAGE
EMPLOYEES, MOVING PICTURE TECHNICIANS, ARTISTS AND
ALLIED CRAFTS OF THE UNITED STATES, ITS TERRITORIES AND
CANADA, AFL-CIO, CLC,
INTERVENOR

———

Consolidated with 20-1179

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Charles P. Roberts, III* argued the cause and filed the briefs
for petitioner.

*Brady Francisco-FitzMaurice*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel, *Ruth E. Burdick*, Acting Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*Denis P. Duffey, Jr.* and *Nicholas J. Johnson* were on the brief for intervenor International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL-CIO, CLC in support of respondent. *Franklin K. Moss* entered an appearance.

Before: TATEL and RAO, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: Petitioner National Hot Rod Association seeks review of a Board decision that it violated the National Labor Relations Act by refusing to bargain (§ 8(a)(5)) with the International Alliance of Theatrical Stage Employees, AFL-CIO. This challenge is really to the Board's certification of the Union's victory in the representation election which was decided by one vote. Since we conclude that the Board was at fault in preventing at least one of the bargaining unit employees from possibly casting a vote, we grant the petition and deny enforcement of the Board order.

# I

The Union filed a petition with the Board to represent all broadcast technicians employed by the Company. These

employees were spread all over the country. The parties entered into a Stipulated Election Agreement, setting the terms of the election. The Agreement stated that the election would be conducted by mail by the Board's Regional Office in Newark. The Regional Office would mail the ballots to voters on Tuesday, November 15, 2016. Ballots were due back to the Regional Office by November 30, and the Board would count the ballots at 10 A.M. on December 2.

The Notice of Election provided to employees stated:

> Those employees who believe that they are eligible to vote and did not receive a ballot in the mail *by* Tuesday, November 22, 2016, should communicate immediately with the National Labor Relations Board by either calling the Region 22 Office . . . or our national toll-free line.

J.A. 97 (emphasis added).

Several employees did not receive ballots and requested replacements. One employee, Robert Logan, contacted the Board promptly on the morning of Wednesday, November 23, calling the Regional Office twice and leaving two voicemails. (The next day was Thanksgiving.) On Friday, Logan left another voicemail with the Regional Office. Then, the following Monday, November 28—five days after Logan had first called—he contacted a Board Agent personally to request a duplicate ballot. The Regional Office finally sent a duplicate ballot to Logan. Logan received his original ballot (postmarked November 15) on December 5 and received his duplicate ballot (postmarked November 28) on December 7.

Other employees had similar problems. At least seven employees sought and received duplicate ballots that they were able to timely return. But at least three were unsuccessful, including Logan, and either did not return a ballot or returned a ballot after the count had taken place.

The Company objected to the election, arguing the Board's delays in sending out replacement ballots made it impossible for some employees to return their ballots on time. Because this irregularity could have disenfranchised a dispositive number of voters—one is sufficient given the close vote—the certification of the Union was defective. The Company also argued that late-arriving votes should be counted because they came in before the final resolution of ballot challenges.

The Board rejected the Company's objections in the representation proceeding and declined to reconsider its position in the unfair labor practice case. It concluded that the Company failed to meet its burden to show that the conduct of the Board caused anyone to miss his or her opportunity to vote. Rather, the vagaries of mail delivery or the employee's own actions were to blame—not the Board. The Board thought that Logan should have made additional efforts to reach the Board, noting that Logan only called the Regional Office but did not also call the Board's national hotline, which was provided as an option in the Notice. And counting late ballots would contradict the Stipulated Election Agreement and Board precedent.

## II

As is well known, an employer who challenges a Board representation proceeding (called an "R" case) must refuse to bargain with a certified union. Then, after the Board holds the employer in violation of § 8(a)(5), the employer can petition for review in a Court of Appeals. *See, e.g.*, *Am. Fed'n of Lab. v. NLRB*, 308 U.S. 401, 406–12 (1940).

Petitioner argues that in this razor-thin election (35 for the Union to 34 opposed) certain employees were denied the opportunity to vote and the Board was at fault for not mailing timely ballots to several of them. Then Petitioner repeats the claim that the Board should have counted some ballots received after the due date in the Election Agreement. The Board responds that Petitioner did not meet the high burden of

demonstrating that the failure of several employees to have their votes counted was an "irregularity" attributable to Board agents. Instead, the problem, according to the Board, was caused by the frustrated voters themselves or, alternatively, was attributable to the vagaries of the U.S. mail delivery system.

The Board's law is rather clear. Although employees have some responsibility for overcoming obstacles to voting, as we noted, if the Board itself causes an "irregularity" and the number of voters possibly disenfranchised could affect the outcome of an election, no certification of the result is appropriate. *Garda World Security Corp.*, 356 NLRB 594 (2011); *Waste Mgmt. of Nw. La., Inc.*, 326 NLRB 1389 (1998); *Visiting Nurses Ass'n of Metro. Atlanta, Inc.,* 314 NLRB 404 (1994). This standard is strict; the Board has even overturned election results if Board agents inadvertently closed a polling location for five minutes, *Wolverine Dispatch, Inc.*, 321 NLRB 796, 796–797 (1996), or even one minute early, *Garda*, 356 NLRB at 594—notwithstanding a failure to show in those cases that any specific voter was disenfranchised. *See also Davis & Newcomer Elevator Co.,* 315 NLRB 715 (1994) (applying a similar standard to mail-in elections).

Given the close election in which one vote was determinative (if there is a tie, the Union loses, *see O'Dovero*, 325 NLRB 998 (1998)), we look to Logan's difficulties first. If the Board bore responsibility for his inability to vote, that is the end of the matter. And we think that is exactly the situation.[1]

We have some sympathy for the Board's lawyer; he had a virtually impossible case. Before us it was claimed that Logan was somewhat at fault because he did not also call the alternative number on the Election Notice, but that strikes us as patently unreasonable. Logan followed the instruction in the Notice which gave him an option to call either the Newark

---

[1] It is therefore unnecessary to consider Petitioner's other arguments.

office which was running the election or the national toll-free line. He took one authorized choice (arguably the more logical choice).

In any event, the Board, responding to Petitioner's claim that it was negligent because it did not monitor the Newark office number, asserted that it did in fact monitor that number. The Board thereby left the devil for the deep blue sea. As Petitioner gleefully pointed out, since the Board was monitoring the Newark number, it was obviously derelict in not responding to Logan for five crucial days. Furthermore—and this is the killer—if the Newark number was monitored and therefore the Board received Logan's message, it would have done Logan no good to have repeated the same message to another number.[2]

As we noted, the Board also claimed that the cause of Logan's frustration in not getting a ballot in time is the fault of the U.S. Mail, not the Board. The Board emphasized that Logan did not receive the original ballot until 20 days after the Board mailed it, and his replacement ballot did not arrive until 9 days after it was sent. So even if the Board had mailed Logan's supplemental ballot immediately on November 23, it likely would have arrived too late.

The problem with that argument is that two other supplemental ballots mailed on November 23 did in fact arrive and were returned to the Board in time to be counted. It should be recalled that under the Board's standard, it is only necessary for a challenger to an election to establish that it was *possible*

---

[2] The Intervenor (the Union) asserts that the Stipulated Election Agreement, which states that voters must call by 5 P.M. on November 22 if they hadn't received their ballot, should control rather than the Notice, which fairly implies one should wait until the next morning. But since it is the Notice that is required to be made available to employees, that argument strikes us as futile. And in any event, it was not adopted by the Board.

for a Board irregularity to have caused a different voting result.[3] Petitioner easily meets that burden; the Board's decision is therefore unreasonable (arbitrary and capricious).

Thus, we grant the Company's petition for review and deny the Board's cross-application for enforcement.

*So ordered.*

---

[3] The Board's brief suggests—extraordinarily—that Logan's vote could be ignored since there are indications that he favored the Union. That position ignores the importance of the *secret* ballot.