# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 14, 2021         Decided January 17, 2023

No. 20-5223

AMERICAN FEDERATION OF LABOR AND CONGRESS OF
INDUSTRIAL ORGANIZATIONS,
APPELLEE

v.

NATIONAL LABOR RELATIONS BOARD,
APPELLANT

———

Consolidated with 20-5226

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:20-cv-00675)

———

*Paul A. Thomas,* Attorney, National Labor Relations
Board, and *Tyler James Wiese*, Attorney, argued the causes for
appellant/cross-appellee. With them on the briefs were *Nancy
E. Kessler Platt*, Associate General Counsel, *William G.
Mascioli*, Assistant General Counsel, *Dawn L. Goldstein*,
Deputy Assistant General Counsel, *Helene D. Lerner*,
Supervisory Attorney, and *Molly G. Sykes*, Attorney.

*Matthew J. Ginsburg* argued the cause for appellee/cross-appellant. With him on the briefs were *Leon Dayan* and *Maneesh Sharma*.

Before: SRINIVASAN, *Chief Judge*, PILLARD and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* RAO.

PILLARD, *Circuit Judge*: Unique among major federal agencies, the National Labor Relations Board (NLRB or Board) sets almost all of its policy through adjudications rather than rules. That makes the object of this case—a 2019 NLRB rule—somewhat unusual. The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) challenges a rule governing the elections in which employees vote on whether to be represented by a union. The Board promulgated the 2019 Rule without notice and comment, asserting that it falls within the Administrative Procedure Act's (APA) exception for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

The 2019 Rule undid a slate of changes pertaining to representation elections that the Board in 2014 had promulgated following notice and comment. The Board in 2019 acted without notice and comment. And it acknowledged that the 2014 Rule had achieved its objective of significantly reducing the time between a representation petition, an election, and the certification of election results, and that reversing those changes would result in longer waits for elections and the benefits that flow from union representation. As the Board explained, and the AFL-CIO agrees, the changes

introduced by the 2014 Rule did not alter the rate at which unions win or lose elections. But the Board nonetheless promulgated the 2019 Rule, viewing it as an advisable set of changes to ensure fair and accurate voting, transparency and uniformity, certainty and finality, and efficiency.

The NLRB argues that the National Labor Relations Act (NLRA or Act), 29 U.S.C. §§ 151-69, mandates direct review from the Board to the circuit court, *see id*. § 160(f), and so asks us to treat this case arriving on its appeal from district court as if it were before us on a petition for direct review by the AFL-CIO challenging the 2019 Rule. The Board also asserts that, even if the district court had jurisdiction, it erred in holding that five challenged provisions of the Rule fall outside the APA's procedural exception. The Board asks us to sustain those provisions even though they were not promulgated by notice and comment rulemaking. The AFL-CIO cross-appeals, arguing that the 2019 Rule as a whole is arbitrary and capricious and that the provision concerning ballot impoundment specifically is arbitrary and capricious and contrary to law.

We hold that the statutory provision for direct review in federal appellate courts of NLRB orders regarding unfair labor practices did not divest the district court of jurisdiction over rules that are exclusively concerned with representation elections, as is the 2019 Rule. On the merits, we hold that the district court erred in concluding that none of the five challenged provisions comes within the procedural exception; we hold that two of them do. Those two are rules of agency procedure, so were validly promulgated without notice and comment. We affirm the district court's invalidation of the rules regarding the eligible employee-voters list, the timeline for certification of election results, and election-observer eligibility. The AFL-CIO's challenge to the 2019 Rule as

arbitrary and capricious when considered as a whole fails. Finally, we hold that the Rule's impoundment provision is contrary to law, making it unnecessary to address whether it is also arbitrary and capricious.

## BACKGROUND

The NLRA covers two important topics in labor relations: the protection of employees' right to elect representatives of their choice, and the prevention of unfair labor practices. *See* 29 U.S.C. §§ 158, 159. The Act addresses those topics in separate sections, with section 8 prohibiting unfair labor practices and providing for enforcement against them, *see id.* § 158, and section 9 outlining the process for conducting elections by which employees may select unions to represent them, *see id.* § 159. As the Board explains in its Rule, the Act's provisions regarding representation "protect the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." Representation-Case Procedures, Final Rule, 84 Fed. Reg. 69,524, 69,524 (Dec. 18, 2019) (hereinafter 2019 Rule). Union representation, where employees choose it, is a statutorily protected means of advancing many other employee rights and interests, including resolving grievances and bargaining collectively with employers.

The NLRA provides for direct review in the federal appellate courts of at least some NLRB actions. Section 10 of the Act, titled "Prevention of unfair labor practices," includes the Act's only such grant of judicial review directly in a court of appeal. *See* 29 U.S.C. § 160(f). It provides:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief

> sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia . . . .

*Id*. The Act thus provides for direct appellate review of "a final order," and places venue where "the unfair labor practice in question" took place. *Id.* Nowhere does the Act specifically address review of Board actions pertaining to representation elections. The Act grants the NLRB general rulemaking authority in section 6, *id.* § 156, and references rulemaking specific to representation and elections in section 9, *id.* § 159(c)(1). Nothing in either section addresses judicial review of NLRB rules as distinct from orders, whether the rules address unfair labor practices or representation elections.

The Rule at issue here addresses the representation election process, which the NLRA describes in some detail. The Act outlines four basic steps for parties to follow to organize a secret-ballot election under Board supervision to determine whether a union will represent a group of employees.

First, an employee, union, or employer may file a petition with the Board calling for an election among a particular group of employees, proposing the group as an appropriate "unit" of representation, and seeking either certification or, less commonly, decertification of a union as the employees' exclusive collective bargaining representative. *See id.*; 2019 Rule, 84 Fed. Reg. at 69,524. Most petitioned-for elections are conducted pursuant to an election agreement reflecting the parties' accord on details like the date of the election and the employees who may appropriately be included in the bargaining unit. Both before and after the Board's 2014 Rule

changes, more than ninety percent of elections were conducted pursuant to agreements. *See* 2019 Rule, 84 Fed. Reg. at 69,528 n.16.

If the parties cannot reach an election agreement, the second step is a hearing to develop the record on which a Regional Director determines whether a "question of representation" exists, *i.e.*, whether the petitioner filed a proper petition concerning a unit appropriate for collective bargaining, so eligible for an employee vote. *See* 29 C.F.R. § 102.64. If the proposed unit would not be appropriate for the purpose of collective bargaining, the Regional Director dismisses the petition; if it would be appropriate, the Regional Director issues a decision and direction of election setting parameters like the election date and the contours of the voting unit. Any party can file a request for Board review of the Regional Director's decision and direction of election.

The third stage is the election itself, in which employees vote by secret ballot for or against union representation. The parties and the Board may also challenge the eligibility of voters during the election, after which they may attempt to resolve any such challenges. Challenged ballots the validity of which remains unresolved are set aside, and the valid ballots are counted at the conclusion of the election. *See id.* § 102.69. The parties litigate the validity of challenged ballots only if they are outcome determinative.

Fourth, after the election, the Board, either itself or through its Regional Director, certifies the election results. *See id.* § 102.69(b). If a majority of employees voted for union representation, the union's certification as the employees' representative obligates the employer to bargain with it in good faith and renders the failure to do so an unfair labor practice. *See* 29 U.S.C. § 158(a)(5). The post-election stage can also

include party objections to the conduct of the election, which the Regional Director investigates, potentially calling a post-election hearing to inform the decision on those objections. *See* 29 C.F.R. § 102.69(c). A Regional Director's decision on objections is subject to review by the Board in response to a party's request. *Id.* § 102.69(c)(2).

The Board first promulgated a set of rules in 1961 setting forth steps and standards for the Board to follow in responding to petitions raising objections to representation elections—a process that the Board has come to refer to as "representation cases." *See* Miscellaneous Amendments, 26 Fed. Reg. 3,885 (May 4, 1961). Since then, the Board has acted to make a variety of minor, unchallenged amendments to those rules without prior notice or request for public comment. *See* Representation—Case Procedures, Final Rule, 79 Fed. Reg. 74,308, 74,310 (Dec. 15, 2014) (hereinafter 2014 Rule). In 2011, the NLRB promulgated a final rule on representation cases after notice and comment, but that rule was challenged and invalidated because the Board acted without a quorum. *See Chamber of Com. v. NLRB*, 879 F. Supp. 2d 18, 20-21, 30 (D.D.C. 2012). The Board regained a quorum and gave public notice and sought comment on the 2014 Rule, which was "almost identical" to its 2011 predecessor, *AFL-CIO v. NLRB* (*AFL I*), 466 F. Supp. 3d 68, 76 (D.D.C. 2020), and which was twice upheld in full, *see Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 218 (5th Cir. 2016); *Chamber of Com. v. NLRB*, 118 F. Supp. 3d 171, 177 (D.D.C. 2015). That 2014 Rule is the backdrop to the rule challenged here.

The 2014 Rule made twenty-five changes to the then-existing rules for representation cases. *See* 79 Fed. Reg. at 74,308-10. Two of the Board's five members dissented. *Id.* at 74,430-60; *see also* Representation-Case Procedures, Request for Information, 82 Fed. Reg. 58,783, 58,783 (Dec. 14, 2017)

(hereinafter 2017 RFI). The 2014 Rule went into effect on April 14, 2015, after President Obama vetoed the resolution Congress passed disapproving the Rule pursuant to the Congressional Review Act, 5 U.S.C. § 801 *et seq. See* 2017 RFI, 82 Fed. Reg. at 58,783.

The Board promulgated the 2014 Rule by notice and comment rulemaking but asserted that "none of this process was required by law" and that "[t]he Board has never engaged in notice and comment rulemaking on representation case procedures, and all of the proposed changes could have been made without notice and comment—in part by adjudication, and in part by simply promulgating a final rule." 79 Fed. Reg. at 74,311. In the Board's view, its amendments were "primarily procedural," any substantive changes "could have been made by adjudication," and the rule was therefore "exempt from notice and comment" under the APA. *See id.* at 74,311 n.9.

In late 2017, the NLRB issued a request for information concerning the operation of the 2014 Rule. *See* 2017 RFI, 82 Fed. Reg. at 58,783. It received nearly 7,000 submissions in response. The AFL-CIO, the largest federation of unions in the United States, made a submission that included an expert report on the effects of the 2014 Rule. The report analyzed data from a five-year period straddling the effective date of the 2014 Rule, comparing the two and a half years of Board data on either side of the rule change. In the report, John-Paul Ferguson, "a leading academic expert on NLRB elections," AFL-CIO Principal & Response Br. 6, explained that the 2014 Rule changes produced "a significant decrease in the time between petition and election and the time between petition and the closing of [representation] cases," Deferred Appendix (D.A.) 103. In contrast to the typical seventy-seven days from petition to closing of a representation case before the 2014

Rule, the average time dropped to fifty-six days after the rule. D.A. 110. Apart from shorter timelines from petition to certification, Ferguson concluded, the 2014 Rule did not cause "any other significant changes in case processing variables or outcomes." D.A. 103. He found, among other things, that the 2014 Rule did not change the rate at which unions win or lose elections, D.A. 108-09, nor the incidence or average length of pre- or post-election hearings, D.A. 111-12.

Two years later, at a time when one Board seat remained unfilled following the end of former Chairman Pearce's term in 2018, a divided four-member Board issued the 2019 Rule. *See* 84 Fed. Reg. at 69,524. The Board expressly invoked the procedural exception in section 553(b)(A) of the APA, 84 Fed. Reg at 69,528, and asserted that it was "not treating the responses to the 2017 Request for Information as notice-and-comment rulemaking," *id.* at 69,528 n.12. All told, the Rule made fifteen changes to then-current provisions, many of which reinstated all or parts of the pre-2014 rules and a handful of which were new. *See id.* at 69,524-26 (concise descriptions), 69,588-600 (amended rules). Board Member McFerran dissented from the 2019 Rule as having arbitrarily and without empirical support delayed employees' enjoyment of their NLRA rights by, among other things, slowing the process in contested cases to the point of tripling the minimum number of days from the filing of a petition for an election to the certification of a union. *Id.* at 69,557-62.

On March 6, 2020, the AFL-CIO filed a four-count complaint in district court, claiming that the 2019 Rule as a whole violated the APA, and that certain provisions were also independently invalid. The parties filed cross-motions for summary judgment. The Board also moved to transfer the case here from district court, arguing that subsection 10(f) of the

NLRA requires direct appellate review of any NLRB order or rule.

On May 30, 2020, one day before the 2019 Rule was set to go into effect, the district court issued an order denying the Board's motion to transfer and granting summary judgment to the AFL-CIO on the ground that five challenged provisions of the Rule did not fall within the APA's procedural exception. About a week later, the court issued an opinion explaining those rulings. *See AFL I*, 466 F. Supp. 3d at 74. The AFL-CIO moved for reconsideration, requesting that the district court rule on its remaining claims. On July 1, 2020, the court issued a supplemental memorandum opinion and order denying the remainder of the AFL-CIO's claims. *See AFL-CIO v. NLRB* (*AFL II*), 471 F. Supp. 3d 228, 234 (D.D.C. 2020).

Our review of both the district court's determination on jurisdiction and its rulings on summary judgment is *de novo*.

## DISCUSSION

### I. Jurisdiction

The Board first argues that subsection 10(f) of the NLRA, which all agree provides direct review in federal appellate courts of at least some "final order[s] of the Board," 29 U.S.C. § 160(f), should be read to require direct circuit-court review of the AFL-CIO's challenge to the 2019 Rule. The Board does not identify any material effect of that position on our consideration of this case: Our review is *de novo* in any event, and the AFL-CIO's filing here concededly would be timely even were we to treat it as a petition for direct review. But

because it reads the statute to require direct review, the Board urges us to exercise original rather than appellate jurisdiction.

The text of section 10(f) is seemingly limited to orders regarding unfair labor practices, and we are reviewing a rule unrelated to such practices. But we have held that direct-review statutes providing for our review of "orders" authorize us to review rules. *N.Y. Republican State Comm. v. SEC* (*NYRSC*), 799 F.3d 1126, 1129-30, 1133 (D.C. Cir. 2015); *Inv. Co. Inst. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 551 F.2d 1270, 1278 (D.C. Cir. 1977); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985). That approach makes good sense here, because when Congress enacted the NLRA in 1935 "courts generally declined to engage in pre-enforcement review of agency rules," *NYRSC*, 799 F.3d at 1134, so Congress spoke of "orders" as shorthand for final agency action.

There is some reason to think Congress's reference to "the unfair labor practice in question" in its direct-review authorization encompasses judicially reviewable Board rules governing representation procedures. It is at least conceivable that the direct-review provision is limited to "unfair labor practice" orders because Congress provided for review of representation disputes only via review of "orders of the Board prohibiting unfair labor practices," *AFL v. NLRB*, 308 U.S. 401, 409 (1940); *see Nat'l Hot Rod Ass'n v. NLRB*, 988 F.3d 506, 508 (D.C. Cir. 2021), not because Congress sought to treat representation rules differently from unfair labor practice rules. As a practical matter, it is not apparent why challenges to representation rules should be heard first in the district court while challenges to unfair labor practice rules come directly here: Both are decided on the administrative record and benefit from prompt resolution. Our precedent, moreover, takes a generous approach to direct-review statutes: Where Congress

12

gives us mixed signals, we resolve statutory ambiguity in favor of direct review in the courts of appeals. *See Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012).

That said, we are ultimately unpersuaded that any implications from the vintage of the NLRA or policy arguments for a common review path suffice to overcome the textual reference to "unfair labor practice" in subsection 10(f) and other statutory indicia that distinguish unfair labor practice rules from those addressing representation procedures. "In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals." *Id.* (internal quotation marks and citations omitted). It is the exception that "[i]nitial review of agency decisions occurs at the appellate level"—an exception reserved for cases as to which "a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action." *Id.* (internal quotation marks and citations omitted).

Applying those principles to the text of subsection 10(f) and the overall structure of the NLRA, we hold that the district court correctly exercised jurisdiction over the AFL-CIO's challenge to the 2019 Rule. Section 10 of the NLRA, addressing the "[p]revention of unfair labor practices," 29 U.S.C. § 160, provides for direct review in federal courts of appeals from some final actions of the Board, *id*. § 160(f). Subsection 10(f) specifies that review may be had in this court or "in the circuit wherein the unfair labor practice in question was alleged to have been engaged" (or, although not relevant here, in the circuit wherein the petitioner "resides or transacts business"). *Id*. The district court correctly reasoned that subsection 10(f)'s textual reference to unfair labor practices, combined with the absence of any mention of determinations governing representation or elections, "strongly suggests that

the provision is only triggered when some kind of unfair labor practice is at issue." *AFL I*, 466 F. Supp. 3d at 84. The statutory phrase defining appellate-court venue options by reference to "*the* unfair labor practice *in question*," a specific iteration of a broader category, implies that the overall provision's object is that category—unfair labor practices—which does not include NLRA rules regarding representation elections. 29 U.S.C. § 160(f) (emphases added).

It is undisputed that unfair labor practices—whether specifically or in general—are not at issue in this pre-enforcement challenge to the 2019 Rule, which concerns exclusively elections regarding union representation. And nowhere in subsection 10(f) or anywhere else in section 10 is there any reference to elections or representation. Rather, subsection 10(f) communicates "that what is being directed to the court of appeals" for the purpose of direct review is NLRB final orders (and, per binding precedent, rules) concerning unfair labor practices. *AFL I*, 466 F. Supp. 3d at 84.

The placement of the direct-appellate-review provision within section 10 confirms that conclusion. To start, the section title, "Prevention of unfair labor practices," announces its topical focus. 29 U.S.C. § 160; *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998). And the subsections surrounding 10(f) make explicit their concern with unfair labor practices. *Cf. Territory of Guam v. United States*, 141 S. Ct. 1608, 1613 (2021) (considering the "family" of provisions when interpreting one specific provision). Subsection 10(a) empowers the Board "to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce." 29 U.S.C. § 160(a). Subsection 10(b) describes the Board's power to issue and pursue complaints regarding charges of unfair labor practices. *See id.* § 160(b). Subsection 10(c) states that if, after taking testimony and

14

potentially hearing argument on an unfair labor practice charge, the Board believes that an unfair labor practice has occurred, it shall, among other things, issue "an order requiring such person to cease and desist from such unfair labor practice." *Id.* § 160(c). And subsection 10(e), in terms parallel to 10(f), allows the Board to petition for enforcement of its orders in any circuit court "wherein the unfair labor practice in question occurred or wherein such person resides or transacts business." *Id.* § 160(e). This context suggests that, like its sister provisions, 10(f) is concerned solely with unfair labor practices, not representation matters.

The structure of the entire NLRA underscores Congress's separate treatment of unfair-labor-practice and union-representation matters, further clarifying that subsection 10(f) applies only to the former. As described above, Congress addressed those two core categories of issues in separate statutory sections: representation matters in section 9, *id.* § 159, and unfair labor practices matters in section 8, *id.* § 158. That structural separation reinforces that subsection 10(f)— with its express reference to unfair labor practices but no mention of representation—does not extend to the representation-case rules at issue here.

Against those textual and structural indicia, the Board's counterarguments fall short. First, the Board's principal argument attacks a strawman. The Board points out that we have held that the term "order" in other direct-review statutes encompasses agency rules, *see* NLRB Principal Br. 18-23 (citing *NYRSC*, 799 F.3d at 1129-30, 1133; *Inv. Co. Inst.*, 551 F.2d at 1278), and asserts that subsection 10(f) is ambiguous as to whether its use of the term "order" includes NLRB rules like the one at issue here. True enough. But the obstacle is not that subsection 10(f)'s reference to "orders" bars us from reviewing a rule. The difficulty for the Board is the subject matter not the

form of the challenged agency action. As the district court explained, subsection 10(f) is inapplicable "because the NLRB's action regulates representation rather than unfair labor practices." *AFL I*, 466 F. Supp. 3d at 87. In other words, subsection 10(f) is not "ambiguous in any sense relevant," *Nat'l Auto. Dealers Ass'n*, 670 F.3d at 270 (citation omitted), because—even accepting that "final order" also extends to rules—the provision applies to rules concerning unfair labor practices, not representation cases.

Second, the Board cannot dismiss subsection 10(f)'s reference to unfair labor practices as merely a "venue provision." NLRB Principal Br. 29. The Board argues that, by including that reference, Congress did nothing more than "suppl[y] petitioners seeking review of unfair labor practice cases with an additional convenient forum" in the place where the unfair labor practice is alleged to have occurred. *Id.* The reference to unfair labor practices qualifies only the venue clause, the Board says, while the rest of the subsection "remains perfectly operative" as "a very plain, general grant of jurisdiction to circuit courts to review all 'final orders of the Board granting or denying in whole or in part the relief sought'"—including final actions not involving unfair labor practices. *Id.* (quoting 29 U.S.C. § 160(f)). But, as the district court acknowledged, subsection 10(f)'s inclusion of a venue-expanding clause does not detract from textual and structural specifications that "the *subject* of a petition for review that is filed with the court of appeals under [subsection 10(f)] must be an NLRB action that pertains to unfair labor practices as opposed to any other topic that the agency might have acted to address." *AFL I*, 466 F. Supp. 3d at 86 (emphasis in original).

We are somewhat puzzled by Congress's decision to provide for direct review in this court for unfair labor practice cases but not for representation matters, given that both types

of cases are heard on agency records and would seem to benefit equally from quick resolution in our court. But we cannot rewrite the statute to resolve what seems a quirk. Thus, pursuant to 28 U.S.C. § 1331, the district court had jurisdiction over the AFL-CIO's challenge to the 2019 Rule, and we exercise appellate jurisdiction under 28 U.S.C. § 1291 to review its judgment.

## II. The APA's Procedural Exception to Notice and Comment

The Board next challenges the district court's ruling that the APA's procedural exception is inapplicable. The district court held that the Board violated the APA by promulgating each of the five challenged provisions of the 2019 Rule without engaging in notice and comment rulemaking. The Board claims the five challenged provisions are exempt from the APA's notice and comment requirements as rules of agency procedure under 5 U.S.C. § 553(b)(A).

In general, the APA requires agencies to publish notice of proposed rules in the Federal Register and to accept and consider comments on them from the public. *See* 5 U.S.C. § 553(b)-(c). Those requirements are central to the APA's "commitment to public notice and participation." *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980). Public participation helps to ensure that regulators are factually well informed and have the benefit of alternative solutions that commenters may suggest. *See id.* at 703-04. Rulemaking that acknowledges and responds to expressed needs and concerns of regulated parties and the affected public tends to be more readily accepted by winners and losers alike. *See Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 662 (D.C. Cir. 1978).

In keeping with the statutory commitment to public participation in rulemaking, "the APA provides only limited exceptions to [its notice and comment] requirements." *Batterton*, 648 F.2d at 700-01; *see id*. at 704. One such exception is for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). We have used the term "procedural exception" as shorthand for that exemption, *see, e.g.*, *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 328 (D.C. Cir. 1994)), and we have referred to rules promulgated under it as "procedural rules," *see, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). But, as the text of the APA makes clear, not all rules that might be categorized as procedural are exempted; the limited carveout is intended for "internal house-keeping measures organizing agency activities." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (quoting *Batterton*, 648 F.2d at 702). And its purpose is "to ensure that agencies retain latitude in organizing their internal operations." *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 707); *accord Bowen*, 834 F.2d at 1047.

We treat rules as procedural if they are "primarily directed toward improving the efficient and effective operations of an agency." *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 702 n.34). "[T]he critical feature of a rule that satisfies the so-called procedural exception is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280 (D.C. Cir. 2000) (internal quotation marks omitted). Where a rule imposes "substantive burden[s]," *Bowen*, 834 F.2d at 1052, "encodes a substantive value judgment," *Pub. Citizen*, 276 F.3d at 640 (quoting *Bowen*, 834 F.2d at 1047), "trenches on substantial private rights [or] interests," *Mendoza*, 754 F.3d at

1023 (quoting *Batterton*, 648 F.2d at 708), or otherwise "alter[s] the rights or interests of parties," *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *Glickman*, 229 F.3d at 280), it is not procedural for purposes of the section 553 exemption. At bottom, the exception for "internal house-keeping measures," *Bowen*, 834 F.2d at 1045, "must be narrowly construed," *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.* (*EPIC*), 653 F.3d 1, 6 (D.C. Cir. 2011). These precedents represent this court's current and consistent approach. *Cf.* Diss Op. 1, 5.

The 2019 Rule governs how the Board supervises representation elections that determine whether a union will represent a group of employees. Many of the Board's representation-election provisions, including provisions of the 2019 Rule, govern or directly affect regulated parties— employers, unions, and employees—and their substantive rights in relation to one another during representation elections. That means much of the election conduct the Board regulates is not internal "agency action[]." *Glickman*, 229 F.3d at 280. In other words, the Board's role in supervising elections does not convert all representation-election rules into rules of internal agency procedure. That said, some of the representation-election provisions do regulate how the parties present disputes to the Board and the process for its decision. Thus, some but not all of the Board's rules are "primarily directed toward improving the efficient and effective operations of [the] agency," *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 702 n.34), or toward "the manner in which [regulated] parties present themselves or their viewpoints to the agency," *Glickman*, 229 F.3d at 280 (quoting *JEM Broad. Co.*, 22 F.3d at 326).

We hold that three of the challenged provisions—those regarding employers' production of voter lists, the delayed

certification of election results, and who may serve as election observers—fall outside the scope of the procedural exception. As detailed below, the voter-list provision trenches on the union's substantive interest in campaigning on equal footing with the employer. The provisions delaying certification cut back on an employer's legal duty post-election to bargain in good faith, effectively eliminating that duty during the pendency of a request for review or, in the absence of such a request, until the time for seeking Board review has passed. And the election-observer provision establishes new substantive criteria for selecting observers that directly affect regulated parties' interests in fair elections. Those provisions all substantively "alter the rights or interests of parties," *Glickman*, 229 F.3d at 280 (quoting *JEM Broad. Co.*, 22 F.3d at 326), and therefore do not qualify as procedural rules for purposes of the section 553 exemption.

However, two of the challenged provisions—those regarding pre-election litigation of certain issues and a related change to election scheduling—are procedural rules within the meaning of section 553(b)(A). Both provisions are "primarily directed toward" internal agency operations, *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 702 n.34), insofar as they each govern the presumptive timing of when the Regional Director will resolve election-related disputes prior to an election. The Board therefore permissibly issued those provisions without notice and comment. We discuss each provision in turn, beginning with the substantive rules.

### A. Substantive Rules

#### 1. Voter list

Once a Regional Director issues a direction of election following a pre-election hearing, the employer must provide both the union and the Board with a list of the names, job

details, and contact information for all eligible employee-voters. *See* 29 C.F.R. § 102.67(*l*); *see also* 2019 Rule, 84 Fed. Reg. at 69,531 & n.28. The Board does not seriously dispute that the primary purpose of that voter list is to facilitate the union's campaign activities because, before receiving the list, the union generally does not have the same ability as the employer to contact employee-voters. Under the 2019 Rule, an employer has five business days from the issuance of the direction of election to provide the voter list. 84 Fed. Reg. at 69,596-97 (codified at 29 C.F.R. § 102.67(*l*)). By contrast, the 2014 Rule required an employer to provide it within two business days. 79 Fed. Reg. at 74,486.

We conclude that the voter-list provision falls outside the section 553 exception for "rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). By changing the timeline for transmission of the voter list, the provision directly addresses the union's ability to contact employees on equal terms with the employer. The voter-list provision thereby "alter[s]" regulated parties' substantive "rights [and] interests" in relation to each other. *Glickman*, 229 F.3d at 280 (quoting *JEM Broad. Co.*, 22 F.3d at 326). The Supreme Court has acknowledged that the Board's requirement that employers share voter lists supports the NLRA-protected right of "fair and free choice of bargaining representatives," in part by "allowing unions the right of access to employees that management already possesses." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767 (1969). By delaying the employer's obligation to share with the union the employee-voters' contact information, the provision "trenches on" the union's substantive interest in campaigning on equal footing with the employer. *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 708). It therefore does not qualify as procedural for purposes of the section 553 exception. *See id.*

21

The voter-list provision is also neither facially nor materially directed at "internal house-keeping." *Bowen*, 834 F.2d at 1045. It does not govern internal agency operations, nor is it principally directed at the "manner in which [regulated] parties present themselves or their viewpoints to the agency," *Glickman*, 229 F.3d at 280 (quoting *JEM Broad. Co.*, 22 F.3d at 326). Instead, it primarily facilitates the transmission of information between parties, not from a party to the Board. *See Mendoza*, 754 F.3d at 1024 (deeming substantive agency's employer-certification procedures that set terms of employer-employee relationships). And it does so outside the context of any agency proceeding. The voter-list provision thus bears none of the hallmarks of a rule that would fall within the procedural exception.

The Board does not dispute the importance of voter lists to the union's ability to campaign, nor the reality that the shift from two days to five within the twenty-day default pre-election period extends the time when the employer has exclusive use of employee-voters' contact information. Instead, Board counsel argues that the voter lists also help the Board conduct elections. The lists, for example, separately identify the employees who are casting their votes subject to challenge, thus making it easier for the Board to identify them. But that seemingly slight convenience to the Board does not obviate the rule's substantive character. Given that the union's substantive interest in campaigning on equal footing with the employer is impaired until the employer produces the voter list, postponing that production necessarily burdens the union's substantive interest. *See Mendoza*, 754 F.3d at 1023. And, tellingly, the Board did not even mention its asserted convenience rationale in the rulemaking.

The Board in its reply brief tries to brush off the delay as, in any event, "*de minimis*." NLRB Response & Reply Br. 26.

That rationale, too, is absent from the rulemaking; indeed, to the contrary, in support of the 2019 change the Board stressed the significance of the added time—for employers. *See* 2019 Rule, 84 Fed. Reg at 69,531-32. And we are unpersuaded by the Board's suggestion that extension of the time to set elections, discussed below, cancels out the delayed provision of the voter list to a union, somehow making the voter-list delay procedural. NLRB Principal Br. 61; 2019 Rule, 84 Fed. Reg. at 69,532. The pre-election period is now presumptively set at twenty days but is often shorter. And, in any event, a three-day head start on campaigning by employers before a union can even access employee contact information to reach potential voters is not erased by the addition of other days both parties might use to campaign. The asymmetry of three additional days of employers' exclusive access to employee-voters' contact information substantively burdens the union's ability to campaign on equal footing.

Reference to pre-2014 practice likewise does nothing to dispel the AFL-CIO's concerns about the disparity under the 2019 Rule between unions' and employers' ability to campaign. Before the 2014 Rule, an employer had to provide the union with the voter list within seven calendar days from the issuance of the direction of election, which is generally equivalent to the five business days specified in the 2019 Rule. *See* 2019 Rule, 84 Fed. Reg. at 69,530-31. When the Board shortened the time to two days in the 2014 Rule, it pointed to widespread advances in recordkeeping, retrieval, and transmission technology since it first recognized unions' right to voter lists in *Excelsior Underwear, Inc.*, 156 NLRB 1236, 1239-40 (1966), as obviating the basis for the original seven-day period. *See* 2014 Rule, 79 Fed. Reg. at 74,353. The 2014 Rule preamble noted that under the prior rule—in addition to the two out of seven days treated as "lost to the weekend"—employers operating under *Excelsior* before the advent of e-

mail and even express delivery services were allocated "3 more days . . . dedicated to service of the list by regular mail." 79 Fed. Reg. at 74,353. *Excelsior*'s own reasoning thus suggests that, without need to rely on the postal service, employers can provide the lists to unions within two days. To the extent the Board nonetheless wishes to revert to granting employers more time than that to provide the lists to unions, it must make such a substantive change through notice and comment procedures.

Finally, the Board and our dissenting colleague liken delayed provision of the voter list to "changing the timeline for filings with an agency," NLRB Principal Br. 61; *see* Diss. Op. 10 (citing *Lamoille Valley R.R. Co. v. Interstate Com. Comm'n*, 711 F.2d 295, 328 (D.C. Cir. 1983)), as a reason to treat it as a "rule[] of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A). But the voter-list provision does not set timelines for an agency's internal processes, nor is it principally about submissions to the agency in support of such process. Our precedent examining "timetable[s] for asserting substantive rights" before an agency, *Lamoille*, 711 F.2d at 328, is, thus, readily distinguished.

The voter-list provision's substantive character is instead established through the antecedent inquiry whether the Board's rule "alter[s]," *Glickman*, 229 F.3d at 280, or otherwise "trenches on" a substantive right or interest, *Mendoza*, 754 F.3d at 1023—here, the union's interest in campaigning on equal footing with the employer. Again, the provision primarily facilitates the transmission of information between parties to "allow[] unions the right of access to employees that management already possesses." *Wyman-Gordon*, 394 U.S. at 767. And it directly affects the parties' primary interest in free and fair bargaining-unit elections. *See id.* Because it impairs a substantive interest, it is subject to the APA's notice and comment requirements.

In sum, considering the "primary benefit" of the voter list to help the union communicate with employee-voters in the run-up to an election, NLRB Response & Reply Br. 27, and the lack of any significant basis to treat this provision as a rule of agency operations, we conclude the delayed voter-list provision determines parties' rights or interests and is substantive. Accordingly, it should have been subjected to public notice and comment. *See Mendoza*, 754 F.3d at 1023. Because it was not, it is hereby vacated and remanded.

## 2. Delayed certification

If employees favoring the union win an election and the Board, or its Regional Director by delegation, certifies the union as the employees' representative, the Act then requires the employer to bargain in good faith with the union. *See* 29 U.S.C. § 158(a)(5); *see also* 2019 Rule, 84 Fed. Reg. at 69,554. Since the 2014 Rule went into effect, a party may file a request for Board review of the decision and direction of election even after the election has occurred. Parties may also file with the Regional Director objections to the conduct of the election and, if unsuccessful, may seek Board review of the Regional Director's decision on those objections. *See* 2019 Rule, 84 Fed. Reg. at 69,526, 69,553-54 (citing 29 C.F.R. § 102.67(c)).

Under the 2019 Rule, a Regional Director will certify election results only after she has resolved any requests for review concerning the decision and direction of election or objections to the conduct of the election or, in the absence of such filings, after the time for seeking Board review has passed. *See* 84 Fed. Reg. at 69,597-99 (codified at 29 C.F.R. § 102.69(b), (c)); *see also id.* at 69,526. The 2014 Rule, in contrast, provided that a Regional Director would certify election results without regard to whether a request for review

was pending or still might be timely filed. *See* 79 Fed. Reg. at 74,487; *see also* 2019 Rule, 84 Fed. Reg. at 69,526, 69,554.

We hold that the provisions delaying certification of election results fall outside the APA's procedural exception because they directly curtail the protective effect on employees of the rights and interests that flow from the election of a representative of their choosing. Delaying certification also suspends the attachment of an employer's legal duty to bargain with a union that has won an election. Such a change "trenches on substantial private rights and interests," necessitating notice and comment before it is made. *Mendoza*, 754 F.3d at 1023 (citation omitted).

In its briefing, the AFL-CIO explains that delayed certification prevents unions from bargaining on behalf of employees—sometimes "for a significant period of time, even years." AFL-CIO Principal & Response Br. 39. For employees who voted for a union expecting it would bargain for better terms and conditions of employment, delayed certification deprives them of a key benefit during that entire period. *See id.* Such deprivation may also erode employees' support for a union that seems unable to deliver promptly on its promise. *See id.* At oral argument, the AFL-CIO elaborated on those points, referencing the challenge of "bargain[ing] a first contract," Oral Arg. Tr. 37:3-4, and the difficulty "for a union to maintain [its] cohesion during that period" after it has won an election but not yet been able to bargain because certification is delayed, *id.* at 39:14-15.

The AFL-CIO also emphasizes the importance of, first, the effect of delayed certification on an employer's duty to bargain in good faith and, second, its effect on the duty not to make unilateral changes in terms and conditions of employment during the term of an existing collective bargaining agreement.

*See id.* at 37:14-38:1. The Board argues that the effects of delay are remediable but addresses only the second of those two effects. It points out that the obligation to refrain from making any unilateral changes extends back to the date of the election, not certification, meaning that, if an employer makes unilateral changes but the union is ultimately certified, those changes can be challenged as unfair labor practices. *See* NLRB Principal Br. 63 & n.174; *see also* Oral Arg. Tr. 37:17-19. But an employer's duty to bargain in good faith to reach agreement on terms and conditions of employment—a duty it owes even to employees not yet covered by any collective bargaining agreement—originates on the date of certification. *See* Oral Arg. Tr. 37:19-23; *see also* NLRB Principal Br. 63. Thus, unions and the employees they represent have no opportunity to later redress delayed certification's impairment of their new right to bargain for terms of employment.

The Board and dissent do not contest those assertions. Nor do they deny that an employer's duty to bargain arises at certification, such that delaying certification eliminates employees' right to have their union promptly engage in collective bargaining on their behalf post-election. *See* NLRB Principal Br. 63 (distinguishing between "the duty to bargain in good faith" and "other duties, such as an employer's obligation to refrain from making unilateral changes" that "extend back to the date of the election, not certification"); Oral Arg. Tr. 46:6-8 (Board counsel stating that, "outside of this specific bargaining obligation, virtually every other meaningful right that attaches to the union representation issue goes back to the election"); Diss. Op. 11-15.

In characterizing the delayed-certification provisions as rules of agency procedure, the Board and dissent insist that, "[a]s a practical matter," delayed certification has "de minimis impact on unions." NLRB Principal Br. 63; *see* Diss. Op. 13.

According to the Board, its "regional offices generally have not issued unfair labor practice complaints asserting that employers were not bargaining pursuant to certifications that are subject to pending requests for review."  NLRB Principal Br. 63 (citing D.A. 217 (2019 Rule, 84 Fed. Reg. at 69,555)); *see also* Diss. Op. 13.  In effect, the Board and our dissenting colleague point to the Board's own underenforcement of employers' duty to bargain as a reason why a rule formally delaying certification does not affect employees' substantive rights or interests.

But that practice does not negate the fact that the new provisions delaying certification shift the parties' substantive burdens during the post-election period.  As the Board explained in the 2019 Rule, the issuance of a certification under the prior rule despite the pendency of a request for review placed the risk on the employer to either refuse to bargain while awaiting the Board's ruling and thereby commit an unfair labor practice if it loses on review, or to proceed to bargain while awaiting the Board's ruling even though a win on review could prove bargaining to have been unnecessary.  84 Fed. Reg. at 69,554-55.  Materially diminishing employers' incentives to bargain promptly upon certification curtails employees' enjoyment of the legal rights that flow from a valid certification.  Thus, the delayed-certification provisions are substantive rules that required notice and comment.

The dissent further contends that we "fail[] to distinguish" our decisions in *Lamoille*, *JEM Broadcasting*, and *Public Citizen*—which, according to our dissenting colleague, each involved rules that altered the "timing for exercising substantive rights."  Diss. Op. 13-14 (citing *Lamoille*, 711 F.2d at 327; *JEM Broad. Co.*, 22 F.3d at 322, 326-27; *Pub. Citizen*, 276 F.3d at 637).  But there is a material distinction.  The rules at issue in *Lamoille* and *JEM Broadcasting* altered the

"timetable for *asserting* substantive rights" before an agency— not the timetable for exercising a substantive right itself. *Lamoille*, 711 F.2d at 328 (emphasis added). In other words, the rules at issue in those cases were primarily directed toward regulating the manner in which parties present their views or otherwise submit requests to the agency, as opposed to their exercise of substantive rights or interests outside of any agency-facing proceeding. In *Lamoille*, we examined an agency's decision to expedite its schedule for considering merger applications and to truncate from 90 days to 60 days the period in which competing railroads could file responses to a proposed merger. *Id.* at 326-27. And in *JEM Broadcasting*, the rule at issue established a "fixed filing period" for license applications for particular commercial FM radio channels and set a 30-day limit on application amendments. 22 F.3d at 322, 327-28. Both those rules set deadlines for filings seeking agency decisions.

Similarly, the rule considered in *Public Citizen* affected the manner in which parties make requests to an agency, without altering their substantive rights or interests. *See* 276 F.3d at 640-41. Specifically, the rule directed State Department personnel to search only for responsive documents that existed prior to the date of a FOIA request, thereby leaving applicants to submit additional FOIA requests to obtain documents created after their request was filed. *See id.* at 637, 640-41. Even as, broadly speaking, the certification delay challenged here, like each of those three cases, involves some form of "timing" change, none of the three prior cases involved a rule that suspended a party's entitlement to a substantive right or interest.

The provisions delaying certification do just that: They eliminate an employer's legal duty to bargain with a union that has won an election during the time it takes the Board to resolve

any requests for review or, in the absence of any such request, until the time for seeking Board review has elapsed. *See* 2019 Rule, 84 Fed. Reg. at 69,597-99 (codified at 29 C.F.R. § 102.69(b), (c)); *see also id.* at 69,526. That direct impact on an employer's legal duty and its employees' associated substantive right is what distinguishes the provisions delaying certification from the rules at issue in *Lamoille*, *JEM Broadcasting*, and *Public Citizen*—and excludes them from the shelter of the procedural exception. *See, e.g.*, *Glickman*, 229 F.3d at 280 ("[Procedural rules] do not themselves alter the rights or interests of parties." (quoting *JEM Broad. Co.*, 22 F.3d at 326)).

Finally, the parties dispute whether delayed certification also affects a union's right to recognitional picketing under 29 U.S.C. § 158(b)(7). *Compare, e.g.*, NLRB Principal Br. 64 (maintaining that it "is simply wrong to assert that this rule affects a union's right to picket for recognition, as the 30-day limitation on picketing contained in Section 8(b)(7) of the NLRA is eliminated by the *filing* of a petition" (footnotes omitted)), *and* NLRB Response & Reply Br. 29 (same), *with, e.g.*, AFL-CIO Principal & Response Br. 37 n.12 (maintaining that "[s]uch picketing would be unlawful absent certification if continued for more than 30 days"). Because the effect of the delayed-certification provisions on the right to collective bargaining is sufficient to bring them outside the APA's procedural exception, we need not resolve the uncertainty surrounding the time limits on recognitional picketing.

### 3. Election observers

Election observers play "the indisputably important role" of "representing their principals, challenging voters, generally monitoring the election process, and assisting the Board agent in the conduct of the election." 2019 Rule, 84 Fed. Reg. at

69,553. The Board has recognized that the presence of both employer-selected and union-selected observers at elections "help[s] to assure the parties and the employees that the election is being conducted fairly." *Id*. at 69,552 (quoting *Browning-Ferris Indus.*, 327 NLRB 704, 704 (1999)). The choice of election observers bears on the foundational interest in electoral legitimacy—both actual and perceived.

As the Board explained in the 2019 Rule, "[t]he practice of permitting the parties to be represented by observers at Board-conducted elections dates to the earliest days of the Act," even though "the Act itself does not make any provision for observers to be present at an election." *Id.* at 69,551. In its decisional law, the Board has long characterized the policy as a "privilege" or "courtesy" that it affords to parties, rather than a right or entitlement. *See id.* (citations omitted). But it matters not that the Board has so characterized its policy of allowing election observers, because "we examine how the rule affects not only the 'rights' of aggrieved parties, but their 'interests' as well." *Chamber of Com.*, 174 F.3d at 212 (citation omitted). The rule's effect on regulated parties' substantive interests in choosing their own election observers suffices to remove it from the category of procedural rules under the APA. *See Mendoza*, 754 F.3d at 1023 (explaining that "[p]rocedural rules do not themselves alter the rights *or interests* of parties" (internal quotation marks and citation omitted) (emphasis added)); *accord Glickman*, 229 F.3d at 280.

The 2019 Rule provides that for manual, or in-person, elections,

> any party may be represented by observers of its own selection; whenever possible, a party shall select *a current member of the voting unit* as its observer, and when no such individual is available, a party should

> select a *current nonsupervisory employee* as its observer. Selection of observers is also subject to such limitations as the Regional Director may prescribe.

84 Fed. Reg. at 69,597 (codified at 29 C.F.R. § 102.69(a)(5)) (emphases added). By comparison, the 2014 Rule stated, in relevant part, only that, "[w]hen the election is conducted manually, any party may be represented by observers of its own selection, subject to such limitations as the regional director may prescribe." 79 Fed. Reg. at 74,486.

The AFL-CIO argues that the 2019 Rule limits unions' ability to select as observers former employees or union staff members who are less likely to be subject to intimidation and often more capable of "send[ing] a message to the employees who are voting that this is a fair election." Oral Arg. Tr. 35:17-36:2. The AFL-CIO further contends that the ability to select a former employee or union staff member as an observer can be helpful when employees are "scared to sit . . . at the table . . . in front of the[ir] employer." *Id.* at 35:17-22.

We conclude the election-observer provision falls outside the APA's procedural exception because it "encodes a substantive value judgment" about the type of observers that best serve the policy goals animating the Board's decision to permit non-Board observers, *Pub. Citizen*, 276 F.3d at 640, and so burdens regulated parties' interests in fair elections. The Board has long recognized parties' choice of observers as an important interest bearing on participants' confidence in the fair conduct of the elections. The Board itself has recognized that the standards governing who may serve as an election observer can directly affect the fairness and outcome of elections, because employee-voters may be "intimidate[d]" by the presence of certain types of observers, such as employees

with "disciplinary power." 2019 Rule, 84 Fed. Reg. at 69,551 n.109 (quoting *United States Gypsum Co.*, 81 NLRB 197 (1949)); *see also id.* at 69,552.

The Board candidly admitted that the core of the provision in question—confining parties to select a current member of the voting unit as their observer whenever possible—"is a new innovation," not a codification of any principle previously developed in the Board's precedent on observers. *Id.* at 69,553. It therefore imposes a "new substantive burden[]," *EPIC*, 653 F.3d at 5 (citation omitted), on the parties by "alter[ing] the standards imposed on" them when choosing observers, *Mendoza*, 754 F.3d at 1024 (emphasis omitted). That substantive character suffices to remove the provision from the agency-procedure exemption from the notice and comment requirement.

Our dissenting colleague does not dispute that the election-observer provision "alter[s] the substantive criteria" by which parties select observers. *Glickman*, 229 F.3d at 281. But she claims the provision "does not encode a substantive value judgment," because "[t]he point [of the provision] is transparency in an election procedure under the control of the Board." Diss. Op. 16. Transparency benefits do not negate the provision's substantive value judgment regarding the type of observers best suited to achieve the Board's policy goals. *See, e.g.*, 2019 Rule, 84 Fed. Reg. at 69,552. More fundamentally, the Board's role in supervising representation elections does not convert every provision regarding election process into a rule of agency procedure. Parties' interests in choosing representatives to observe elections and help ensure that employees may vote free from intimidation are substantive interests in the conduct of choosing or declining union representation.

Nothing in *Guardian* requires us to treat the election-observer provision here as a matter of agency procedure. *Cf.* Diss. Op. 16-17 (citing *Guardian*, 589 F.2d at 665). The rule at issue in *Guardian* concerned mandatory, annual audits of federally insured savings and loan institutions pursuant to an unchallenged provision that "specifie[d] in considerable detail criteria that must be met before an audit or an auditor will be satisfactory to" the Federal Savings & Loan Insurance Corporation (FSLIC). 589 F.2d at 661. Guardian challenged the part of FSLIC's rule in which the agency "exercise[d] an option" provided by a preexisting rule "to require that audits be performed by accountants from the private sector," rather than as incidental to other examinations by FSLIC staff. *Id.* at 665. We described the agency's decision that its examiners would no longer conduct those audits as "unquestionably one of agency procedure." *Id.* The Board's election-observer provision, unlike the FSLIC's rule, is not the "necessary consequence of," *id.*—or even arguably related to—a decision about the duties of NLRB staff. And election observers, unlike auditors, play a role in representing unions and employers to third parties—namely, employee-voters. *See* 2019 Rule, 84 Fed. Reg. at 69,553.

In short, because the election-observer provision imposes new "substantive burden[s]" on the parties' interests in fair elections, employee-voters' perceptions of both employer and union, and voters' ultimate confidence in the elections, it falls outside the APA's exception for "procedural" rules. *EPIC*, 653 F.3d at 5; *accord Mendoza*, 754 F.3d at 1023-24.

## B. Procedural Rules

We turn next to the two remaining challenged provisions of the 2019 Rule: those regarding pre-election litigation of certain issues and a related adjustment to the default rule for

election scheduling. Unlike the other challenged provisions, these two are principally "internal house-keeping" rules, *Bowen*, 834 F.2d at 1045; they are both "primarily directed toward improving the efficient and effective operations of [the] agency," *Mendoza*, 754 F.3d at 1023 (quoting *Batterton*, 648 F.2d at 702 n.34), and "impose[] no new substantive obligations" or burdens upon the parties' rights and interests, *EPIC*, 653 F.3d at 6. We therefore hold that these two provisions are procedural rules exempt from notice and comment under section 553.

## 1. Pre-election litigation of voter eligibility, unit scope, and supervisory status

As referenced above, employers and unions sometimes disagree over which employees may be appropriately encompassed within a bargaining unit. Such disputes affect who is eligible to vote in an election: only votes cast by employees who would be within the proposed unit count toward determining the outcome of the election. For example, parties may disagree about whether an employee is a supervisor and accordingly excluded from the NLRA's protections, outside any proposed bargaining unit, and ineligible to vote. In most cases, the parties resolve such disputes through election agreements. But when the parties do not settle those issues themselves, it falls to the NLRB to decide them.

Under the 2019 Rule, "[d]isputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the Regional Director before an election is directed." 84 Fed. Reg. at 69,593 (codified at 29 C.F.R. § 102.64(a)). That presumption replaced the 2014 Rule's provision that "[d]isputes concerning individuals' eligibility to vote or inclusion in an appropriate unit ordinarily need not be litigated or resolved before an election is

conducted." 79 Fed. Reg. at 74,482. Under the old rule, individuals whose disputed eligibility was undecided at the time of the election would cast their votes subject to challenge. After the election, the eligibility or inclusion disputes would be resolved as necessary, such as when the votes of the contested individuals could affect the outcome of the election or, if the pro-union votes prevailed in any event, to determine whether contested individuals were appropriately treated as part of the bargaining unit.

The AFL-CIO argues that this provision of the 2019 Rule falls outside the APA's procedural exception because it "vests parties with an affirmative, substantive right, most often exercised by the employer, to obtain a pre-election advisory opinion regarding the status of individual employees." AFL-CIO Principal & Response Br. 28-29. It further contends the provision is substantive because it builds in a source of unjustified delay by "add[ing] the prerequisite of resolving these individual eligibility issues before a petitioning party may obtain a Board election." *Id.* at 28. It asserts the prior practice of deferring resolution of eligibility and scope questions until after an election was more efficient where the margin of election victory was sufficient to moot the ballot challenges.

The Board responds that the provision merely changes "*when* those issues are presented to, and decided by, the Board," NLRB Principal Br. 55 (emphasis in original), and, even then, only "in the small number of contested election cases"—around ten percent—"that the Board hears per year," *id.* at 57. At least some of the contested election cases are too close to moot ballot disputes. And even when a union's win is decisive, disputes affecting individuals' inclusion or not in the unit remain live. *See* NLRB Response & Reply Br. 19-20.

The provision calling on the Regional Director typically to decide issues of voter eligibility and unit scope before rather than after the election is procedural, not substantive. It is directed at "agency actions that do not themselves alter the rights or interests of parties." *Glickman*, 229 F.3d at 280 (quoting *JEM Broad. Co.*, 22 F.3d at 326). And it does not appear from the record that reversing the presumptive pre-election timing of those decisions "substantively affects" regulated parties to a "degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." *EPIC*, 653 F.3d at 6. As the Board explained in the 2019 Rule, the provision marks a return to the pre-2014 approach. *See* 84 Fed. Reg. at 69,525.

In holding that the provision falls outside the procedural exception, the district court expressed concern that reverting to a process associated with delays "will hinder the employees' prospects of mobilizing a sufficient number of peers to unionize the workplace," *AFL I*, 466 F. Supp. 3d at 91, but the AFL-CIO itself does not so argue. Indeed, the AFL-CIO's own expert concluded that the 2014 Rule, successfully shortening case times, did not affect rates of unionization. D.A. 103. The expert similarly found that statistics regarding frequency and length of hearings were unaffected by the shift in their presumptive timing: "Neither the probability of a case's having a pre-election hearing nor the average length of those hearings changed, over time or in the wake of the [2014] rule change." D.A. 111.

Contrary to the AFL-CIO's assertion, the provision calling on Regional Directors to decide eligibility disputes before an election cannot fairly be said to create an "affirmative, substantive right" in any party to insist that they do so. AFL-CIO Principal & Response Br. 28-29. By its terms, the provision sets only the sequence Regional Directors

"normally" should follow. 2019 Rule, 84 Fed. Reg. at 69,540. It neither prevents parties from agreeing to defer resolutions until after an election, nor prevents Regional Directors from deciding over objection to defer decision of eligibility disputes in appropriate cases. *See id.* at 69,541-42 (noting that rule establishes only when Regional Directors "normally" will decide, and that the new provision is "not imposing a requirement that, absent agreement of the parties to the contrary, all eligibility issues must be resolved prior to an election" but preserves "the discretion of the regional director to defer eligibility and inclusion issues").

The record, then, does not bear out the contention that the parties' substantive rights or interests are affected by returning to the pre-2014 default sequence for the Regional Director's resolution of issues of voter eligibility, unit scope, and supervisory status. The change principally affects the manner in which employers and unions present themselves and their views to the Board and in which it decides their disputes, rather than the parties' substantive rights or interests. *See Lamoille*, 711 F.2d at 328; *Glickman*, 229 F.3d at 280-81; *JEM Broad. Co.*, 22 F.3d at 327-28; *cf. Mendoza*, 754 F.3d at 1023-24. Specifically, for elections not conducted pursuant to election agreements, the provision sets the sequence the NLRB expects its Regional Directors ordinarily to follow in deciding disputed questions of eligibility and scope.

We accordingly hold that the provision regarding pre-election litigation is a procedural rule validly promulgated without prior notice and comment.

## 2. Election scheduling

Following the pre-election hearing that occurs in those cases not conducted under an election agreement, the Regional Director either dismisses the petition calling for an election if

no question of representation exists or, if she identifies such a question, issues a decision and direction of election. The direction of election often includes details like the date of the election.

The 2019 Rule builds in a presumptive waiting period of twenty business days immediately following the direction of election to allow the Board to rule on disputes between the parties. It states that the Regional Director

> shall schedule the election for the earliest date practicable, but unless a waiver is filed, the Regional Director will normally not schedule an election before the 20th business day after the date of the direction of election, to permit the Board to rule on any request for review which may be filed.

2019 Rule, 84 Fed. Reg. at 69,595 (codified at 29 C.F.R. § 102.67(b)). By contrast, the 2014 Rule simply provided that "[t]he regional director shall schedule the election for the earliest date practicable." 79 Fed. Reg. at 74,485. In the 2019 Rule, the Board acknowledged that the new provision will generally result in about four weeks between the direction of election and the election itself, as compared to about two weeks under the 2014 Rule. *See* 84 Fed. Reg. at 69,546.

The AFL-CIO argues that the 2019 Rule's election-scheduling provision is substantive because it "deprives a petitioning party of its existing right to a prompt election," AFL-CIO Principal & Response Br. 31, and affects "how much time parties have to communicate with employees prior to the election," *id.* at 32 (internal quotation marks and citation omitted). The Board responds that we have previously held that "changes to agency timelines are procedural, not substantive," NLRB Principal Br. 58-59 (citing *Lamoille*, 711 F.2d at 328), and that the provision addresses "the internal

workings of the agency by, among other effects, giving the Board more time to rule on requests for review prior to elections," *id.* at 60.

We hold that the election-scheduling provision is procedural. Like the rule at issue in *Lamoille*, it comprises part of the "timetable for [regulated entities to] assert[] substantive rights," 711 F.2d at 328, namely, particular employees' right to vote for or against a union to represent them as a defined bloc. And, as in *Lamoille*, the relevant inquiry is whether the timetable unduly constrains the rule challenger's opportunity to state its case. *See id.* Whereas in *Lamoille*, the "proper question" was "whether the time allotted [was] so short as to foreclose effective opportunity to make one's case on the merits," *id.*, here, we might in fairness reverse the question: whether the time allotted between the direction of election and the election itself is so long as to impede a union's opportunity to make its case on the merits to employee-voters. Indeed, the longer a case drags on, the more risk that support for a union (or other impetus to call for an election in the first place) will dissipate. *Cf.* Oral Arg. Tr. 36:16-37:8, 39:10-18 (counsel for the AFL-CIO explaining that delays in bringing a representation case to resolution can diminish employees' support for a union).

The time allotted by the election-scheduling provision is not so long as to impede the union's opportunity to make its case to employee-voters. Like the provision regarding pre-election litigation of certain issues, the election-scheduling provision is a return to the pre-2014 rules for representation cases. *See* 2019 Rule, 84 Fed. Reg. at 69,525. The pre-2014 rules provided for twenty-five to thirty calendar days between the direction of election and the election itself, which is functionally equivalent to the twenty business days specified in the 2019 Rule. *See id.* at 69,545. And the evidence in the

record shows that this timing change did not affect the rate at which unions or employers prevailed. *See id.* at 69,528; D.A. 103.

Finally, the election-scheduling provision is directed toward improving the efficient and effective operations of the Board, which generally indicates a procedural, rather than substantive, rule. *See Mendoza*, 754 F.3d at 1023. The provision itself specifies that the twenty-business-day period is "to permit the Board to rule on any request for review which may be filed," 2019 Rule, 84 Fed. Reg. at 69,595 (codified at 29 C.F.R. § 102.67(b)), reflecting the agency's preferred approach to "internal house-keeping." *Bowen*, 834 F.2d at 1045. As the Board elaborated in the Rule, it gives the Board "a realistic opportunity" to "decid[e] issues prior to the election . . . [and] contribute[s] to a more efficient resolution of the question of representation by clearing away issues that may otherwise linger on after the election." 2019 Rule, 84 Fed. Reg. at 69,546.

The precise timing of an election does not itself alter any extant legal duty; it presumptively delays the process for determining whether the employer's legal duty to bargain (among other duties) will even arise. That distinguishes the Board's election timing provision from the provision delaying certification of election results. Only the latter directly alters an employer's legal duty and its employees' associated substantive right during a certain period post-election. *See supra* Section II.A.2. We accordingly conclude that our precedent places the election-timing provision on the procedural side of the section 553 procedural/substantive dividing line even as the delayed-certification provision is properly treated as substantive. *See Mendoza*, 754 F.3d at 1023-24.

In sum, we hold that the Board acted permissibly in treating the election-scheduling provision as a procedural rule and promulgating it without notice and comment.

### III. Arbitrary-and-Capricious Challenge to the 2019 Rule as a Whole

In its cross-appeal, the AFL-CIO claims that the 2019 Rule as a whole is arbitrary and capricious in violation of the APA. It emphasizes the "uncontroverted evidence" that the 2014 Rule significantly reduced the overall duration of representation cases. AFL-CIO Principal & Response Br. 44; *see also id.* at 47. And it argues that the Board's rationale that the 2019 Rule promotes finality is insupportable given that the Rule "extend[s] multiple deadlines, permit[s] more litigation, and delay[s] the attachment of legal duties." *Id.* at 44. The AFL-CIO accuses the Board of ignoring data on the 2014 Rule's effect on case timelines, *id*. at 47-48, and criticizes the Board for "not even cit[ing] anecdotal evidence of problems with the deadlines" established by the earlier rule, *id.* at 51.

But, as the district court explained, "the record establishes that the Board exercised its discretion with relevant information in hand and with eyes wide open concerning the impact of the significant changes that it was adopting." *AFL II*, 471 F. Supp. 3d at 241 (citing *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 618-19 (1991)). Thus, the 2019 Rule as a whole passes muster under the APA.

In the extensive preamble to the 2019 Rule, running more than thirty pages, the Board repeatedly acknowledges that its changes will result in longer waits before elections relative to the 2014 Rule. *See, e.g.*, 2019 Rule, 84 Fed. Reg. at 69,528, 69,546, 69,557. And the Board expressly notes the evidence that the AFL-CIO says it ignored—"that the median time between the filing of a petition and the election has been

significantly reduced since the 2014 amendments became effective." *Id.* at 69,528; *see also id.* at 69,528 n.15 (citing statistics on case lengths). The Board nonetheless concludes that the 2014 Rule's "gains in speed have come at the expense of other relevant interests," like transparency and uniformity, and finality and certainty, *id.* at 69,528-29, and, in the 2019 Rule, made "non-statistical policy choices" about how to further those other interests, *id.* at 69,557.

The Board gives a rational account of how the 2019 Rule advances interests apart from speed. For example, the Board adequately explains that the election-scheduling provision—which supplements the "earliest date practicable" language with a default minimum period of twenty business days—promotes transparency and uniformity by making the timing of elections more predictable for parties. *See id.* at 69,546. It also explains that the provision regarding pre-election litigation of voter eligibility, unit scope, and supervisory status could provide employee-voters with more complete information about "who they are voting to join in collective bargaining." *Id.* at 69,541.

On finality, the district court aptly distinguished between the different forms that interest might take, and how the Board might value one form over another. On the one hand is the kind of finality that "requires all disputes about the outcome of an election to be resolved prior to certification," which prizes the "definitiveness" of certification. *AFL II*, 471 F. Supp. 3d at 242. On the other hand is "finality in terms of efficient election results that facilitate relatively rapid certification," but with the potential that such a certification could be undone if the Board ultimately granted a request for review. *Id.*

In the 2019 Rule, the Board makes clear its preference for the former kind of finality. Early on, the Board asserts

generally that "[t]he mere fact that elections are taking place quickly does not necessarily mean that this speed is promoting finality or the most efficient *resolution* of the question of representation." 2019 Rule, 84 Fed. Reg. at 69,529 (emphasis added). Later, in the context of the provision calling for pre-election resolution of issues like unit scope, it explains that "the Board should strive to maximize the opportunity for an election vote to provide immediate finality, subject only to the filing of objections to conduct allegedly affecting the results," which necessarily cannot be litigated before an election. *Id.* at 69,540. Regardless of whether one agrees with those explanations as a policy matter, we cannot say they are irrational.

The Board's weighing of competing interests—including variations on the same interest—in the 2019 Rule was reasonable and sufficiently explained. The Rule therefore is not arbitrary and capricious as a whole.

## IV. The 2019 Rule's Impoundment Provision

Under the 2019 Rule, if a party files a request for review of a direction of election within ten business days of its issuance by the Regional Director, and the Board either grants the request or does not rule on it before the election occurs, then "all ballots shall be impounded and remain unopened pending such ruling or decision." 84 Fed. Reg. at 69,595 (codified at 29 C.F.R. § 102.67(c)). The AFL-CIO claims that the impoundment provision violates the APA in two respects. First, it argues that the provision is arbitrary and capricious, in part because it "forc[es] the Board to automatically decide any issue timely raised in a request for review without evaluating whether the particular issue is likely to be rendered moot by the election results." AFL-CIO Principal & Response Br. 54. Second, the AFL-CIO argues that the provision is contrary to law, namely, section 3(b) of the Act.

Section 3(b) of the Act allows the Board to delegate certain powers regarding the resolution of representation cases to Regional Directors. As relevant here, it provides that "the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director." 29 U.S.C. § 153(b). Because we hold that the impoundment provision is contrary to law as a prohibited stay of action by Regional Directors and vacate it on that basis, we need not address the AFL-CIO's claim that it is arbitrary and capricious.

The impoundment provision "operate[s] as a stay" for purposes of section 3(b). *Id.* As the Board concedes, impoundment "postpones the count[ing]" of ballots. 2019 Rule, 84 Fed. Reg. at 69,548. And the counting of ballots is an "action taken by the regional director" as part of her delegated authority under section 3(b). 29 U.S.C. § 153(b). The impoundment provision thus falls squarely within the meaning of a "stay" under section 3(b).

The Board strains against the statute's plain text. It argues that section 3(b) speaks only to "a stay of any action *taken* by the regional director," NLRB Response & Reply Br. 59 (citation omitted), and that, because impounding ballots happens "before the Regional Director issues a certification, that is, *before* an action has been '*taken*,'" it is not a "stay" within the meaning of that section, *id.* at 61. Alternatively, the Board argues that, even if section 3(b) were ambiguous as to whether impounding ballots is "a stay of any action taken"— because "taken" might refer only to past action or both past and future action—its interpretation of 3(b) as referring only to past action is reasonable. *See id.* at 63-68.

The Board's arguments miss the mark. Section 3(b) is clear: "a stay of any action taken" applies to past, present, and future actions taken by the Regional Director. As the AFL-CIO explains, the word "taken" in section 3(b) is a "participial adjective modifying the noun 'action,'" not part of a "past tense verb phrase." AFL-CIO Principal & Response Br. 59. Used in that way, the word "taken" is timeless; it refers to past, present, and future action. *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722 (2017); *see also* Diss. Op. 19 n.5. Accordingly, impoundment "operates as a stay" under section 3(b) regardless of whether the impoundment occurs before the Regional Director issues a certification. 29 U.S.C. § 153(b).

Even if section 3(b) were ambiguous (it is not), the Board's interpretation would not carry the day. In reviewing agency action, "we look only to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations." *Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 263 (D.C. Cir. 2018) (internal quotation marks and citation omitted). The Board's explanation in the preamble does not so much as mention the word "taken." *See* 2019 Rule, 84 Fed. Reg. at 69,547-49. And the cursory explanation that the Board did provide does not do the trick. In attempting to reconcile the impoundment provision with section 3(b) of the Act, the Board said that "impounding the ballots is not a 'stay' of the regional director's action" because "impoundment only postpones the count." *Id.* at 69,548. But insisting that something is not a "stay" because it is actually a "postpone[ment]" is no explanation at all. The Board's defense of its impoundment provision, thus, fails to persuade.

Our dissenting colleague's alternative defense of the Board's impoundment provision fares similarly. She agrees with our conclusion that the provision operates as a stay, *see* Diss. Op. 18-19, but contends that "the Board has specifically

ordered a stay" via "rulemaking," making it permissible under section 3(b), *id.* at 20. Tellingly, the Board did not itself rely on the "specifically ordered" clause in section 3(b) as an affirmative argument. *See* NLRB Response & Reply Br. 58-69.

The dissent's reading of that clause is not viable. Recall that section 3(b) provides:

> [U]pon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director.

29 U.S.C. § 153(b). The statutory text makes plain that "specifically ordered by the Board" means ordered in a given case, not ordered as a general matter by rulemaking. *Id.* Indeed, the phrase "unless specifically ordered by the Board" modifies the circumstances under which "such *a review* shall not . . . operate as a stay of any action taken by the regional director." *Id*. (emphasis added). "[S]uch a review" refers to the Board's review in a particular case; it is "a review" that arose "upon the filing of a request therefor with the Board." *Id.* In sum, section 3(b) permits the Board's "review" in a particular case to "operate as a stay of any action taken by the regional director" only when "specifically ordered by the Board" in that case. *Id.* Section 3(b)'s "specifically ordered" clause does not disturb our conclusion that the impoundment provision is contrary to law.

\* \* \*

For the foregoing reasons, we affirm the district court's rulings that it had jurisdiction over the AFL-CIO's challenge to

the 2019 Rule, and that the Rule is not arbitrary and capricious as a whole. However, we reverse in part the district court's ruling on the APA's procedural exception, leaving the court's vacatur in place only as to the provisions regarding an employer's production of voter lists, delayed certification, and election observers. Those three provisions must remain vacated unless and until the Board repromulgates them with notice and comment. We also reverse the district court's ruling that the impoundment provision is not contrary to law and thus vacate that provision as well.

Because we reverse in part the district court's ruling on the APA's procedural exception but affirm its ruling that the Rule is not arbitrary and capricious as a whole, we remand for the court to consider the AFL-CIO's remaining claims—the undecided claims in Counts Three and Four—in the first instance.

*So ordered.*

RAO, *Circuit Judge*, concurring in the judgment in part and dissenting in part: The National Labor Relations Board has adjusted the rules for representation elections more than three dozen times without notice and comment since 1961. The 2019 Rule at issue here is the latest iteration. It reverses several 2014 changes to details of election administration. Applying an obsolete legal standard, the majority holds for the first time that some of the Rule's provisions are substantive and therefore do not fall under the Administrative Procedure Act's (APA) exception to notice and comment for procedural rules. *See* 5 U.S.C. § 553(b)(A). Under the correct standard, however, these are classic procedural rules and notice and comment was not necessary. In promulgating them, the Board balanced one procedural interest (speed) against others (like finality and transparency). I would also uphold an undisputedly procedural provision that requires ballots to be impounded pending review of an election by the Board because the provision is consistent with statutory requirements and reasonably explained.

The Board has discretion to direct and manage disputes over representation, and it has properly issued procedural rules that do so. Because I would uphold the 2019 Rule in its entirety, I respectfully dissent.

I.

The Board oversees the formation of collective bargaining relationships between private companies and their employees. National Labor Relations Act of 1935, Pub. L. No. 74-198, 49 Stat. 449 (codified as amended at 29 U.S.C. §§ 151–69). When employees seek to unionize, the Board is responsible for directing elections and certifying the results. 29 U.S.C. § 159(c). As part of this responsibility, the Board has long prescribed and regularly updated rules for election administration. The majority summarizes this history but glosses over two important points. First, the overwhelming and

previously unchallenged practice of the Board has been to issue rules of election administration without notice and comment. Second, these rules have consistently balanced procedural interests, particularly the speed, finality, transparency, and uniformity of elections. The 2019 Rule is no different.

The Board first promulgated a set of rules to govern elections in 1961. The rules revamped the entire election process, delegated authority to regional directors to resolve pre-election disputes and run elections, and significantly decreased the time it took to conduct elections. Representation-Case Procedures, Notice of Proposed Rulemaking, 79 Fed. Reg. 7,318, 7,320 (Feb. 6, 2014) (recounting history). The Board nevertheless issued the rules without notice and comment. In the following decades, the Board modified its election rules more than three dozen times, always without notice and comment. Representation-Case Procedures, Final Rule, 79 Fed. Reg. 74,308, 74,310 (Dec. 15, 2014). When, in 2011 and 2014, the Board broke with this practice and used notice and comment to modify its election rules, it emphasized that notice and comment was unnecessary. *Id.* at 74,311; Representation-Case Procedures, Final Rule, 76 Fed. Reg. 80,138, 80,148 (Dec. 22, 2011). The Board promulgated the 2019 Rule at issue here without notice and comment, explaining that the Rule was procedural and the additional process unnecessary. Representation–Case Procedures, Final Rule, 84 Fed. Reg. 69,524, 69,528 (Dec. 18, 2019).

The Board has correctly classified election rules as procedural for over 60 years.[1] Adjustments to the rules have been aimed at archetypal procedural values, such as ensuring

---

[1] If the election rules were properly deemed substantive, a longstanding practice of the Board would not insulate them from the requirements of notice and comment rulemaking.

votes are "recorded accurately, efficiently and speedily." *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 331 (1946) (describing the Board's goals for its election rules and regulations). The oscillation over time can be explained by the fact that some values compete and experience may cause the Board to strike a different balance. For example, the Board has long worked to speed up the election process, including in the 2014 Rule. 84 Fed. Reg. at 69,528. But the Board has also sought to improve the transparency, uniformity, and finality of elections. *Id.* at 69,529.

In 2019, the Board made some modifications to promote finality and predictability, explaining the "gains in speed" over the years had "come at the expense of other relevant interests." *Id.* at 69,528–29. The Board acknowledged the changes might come "at the cost of some promptness," but concluded the benefits outweighed the costs. *Id.* at 69,548. "[T]he mere fact that an election is conducted promptly does not mean that the question of representation has been resolved." *Id.* at 69,545. The Board has an interest in promoting finality and certainty to employers and unions, ensuring that election challenges do not "linger on … for weeks, months, or even years." *Id.* at 69,529. As it has for more than six decades, the Board considered and traded off various procedural values in its latest modification to the rules governing election administration.

## II.

The AFL-CIO argues that the 2019 Rule is substantive and thus the Board was required to follow notice and comment procedures. When an agency promulgates a rule, usually it must publish notice in the Federal Register and submit the rule to the public for comment. 5 U.S.C. § 553(b)–(c). But some rules are exempt, including "rules of agency organization, procedure, or practice." *Id.* § 553(b)(A). This case requires us

to distinguish "substantive" rules on the one hand, which are subject to notice and comment, from "procedural" rules on the other, which are not. While the line between substantive and procedural rules is sometimes difficult to discern, following the principles articulated by our decisions over the last few decades, the 2019 Rule is procedural and therefore was properly promulgated without notice and comment.

To determine whether a rule is procedural or substantive, we ask whether it "encodes a substantive value judgment." *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 640 (D.C. Cir. 2002) (quoting *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1047 (D.C. Cir. 1987)). In particular, a substantive rule encodes a value judgment about primary conduct whereas a procedural rule governs secondary conduct. *See Air Transp. Ass'n of Am. v. Dep't of Transp.*, 900 F.2d 369, 383 (D.C. Cir. 1990) (Silberman, J., dissenting), *remanded*, 498 U.S. 1077 (1991), *vacated as moot*, 933 F.2d 1043 (D.C. Cir. 1991); *JEM Broad. Co. v. FCC*, 22 F.3d 320, 328 (D.C. Cir. 1994) (disavowing the *Air Transport* majority's reasoning and noting the majority is no longer binding precedent); *cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994) ("[R]ules of procedure regulate secondary rather than primary conduct."). For example, "judgment[s] about what mechanics and processes are most efficient" are procedural. *JEM Broad.*, 22 F.3d at 328. A procedural rule does not become substantive solely because the parties prefer one type of procedure over another. "*All* decisions, to the extent that they derive from reasons, necessarily are based on the value judgment that the chosen option is better, in some relevant way, than its alternatives." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000).

The mine run of facially procedural rules will in fact be procedural; however, even a rule that is facially procedural may

be deemed substantive if the effects are so "sufficiently grave" or create such an "extreme procedural hurdle[]" that the substance swallows the procedure. *See Lamoille Valley R.R. v. ICC*, 711 F.2d 295, 328 (D.C. Cir. 1983). Moreover, if a rule of procedure "substantively affects the public" in some ancillary way, it might require notice and comment because of those impacts. *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6 (D.C. Cir. 2011) ("*EPIC*") (recognizing the "personal privacy" impact on the public of TSA technology that produced "an image of the unclothed passenger").

Instead of following these decisions, the majority in effect applies a 1970s framework in which "substantial impact" was the touchstone of a substantive rule. *See Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1112 (D.C. Cir. 1974). While nodding to our more recent cases, the majority primarily evaluates whether the 2019 Rule has something like a "substantial impact" on the parties. The majority begins its analysis of each rule by looking at the degree to which "substantial" rights or interests are impacted. This is the wrong threshold question— at the outset we consider whether a rule regulates primary or secondary conduct. A rule is presumed procedural when it regulates only secondary conduct and the mere fact that such a rule impacts legal rights does not make it a substantive rule. The majority avoids the language of substantial impact, but uses synonyms that amount to the same thing, considering whether the Rule "direct[ly] impact[s]," "burdens," "affects," "curtails," or "trenches on" various rights and interests.

The majority's analysis is directly at odds with this circuit's more recent decisions. We have repeatedly held that a "substantial impact" or "substantial burden" does not make a rule substantive. *See Glickman*, 229 F.3d at 281 ("[E]ven if the [rule] *did* impose a substantial burden … that burden would not convert the rule into a substantive one that triggers the APA's

notice-and-comment requirement."); *EPIC*, 653 F.3d at 5 ("[A] rule with a 'substantial impact' upon the persons subject to it is not necessarily a substantive rule under § 553(b)(3)(A)."); *cf. Cabais v. Egger*, 690 F.2d 234, 237 (D.C. Cir. 1982) (noting, in the context of interpretive rules, that just because an "agency action has substantial impact does not mean it is subject to notice and comment"). We retired the substantial impact or burden test because "even unambiguously procedural measures affect parties to some degree." *Pub. Citizen*, 276 F.3d at 640 (cleaned up).

Moreover, determining whether a rule impacted, affected, or burdened substantive rights did not track the text of the APA or comply with the Supreme Court's command in *Vermont Yankee* to avoid extratextual procedures. *See Cabais*, 690 F.2d at 237 ("Since *Vermont Yankee*, it is clear that a court cannot engraft additional procedures on agency action beyond those contemplated by the APA.") (cleaned up). As we have recognized, "[o]f course, procedure impacts … outcomes and thus can virtually always be described as affecting substance, but to pursue that line of analysis results in the obliteration of the distinction that Congress demanded." *JEM Broad.*, 22 F.3d at 326 (quoting *Air Transp.*, 900 F.2d at 383 (Silberman, J., dissenting)).

If a rule is procedural on its face that will usually be the end of the matter unless the effects of the rule are "sufficiently grave" or create an "extreme procedural hurdle." *Lamoille Valley*, 711 F.2d at 328. In true boundary cases, our standards recognize that the distinction between procedural and substantive rules may collapse and that unusual or onerous procedures may in fact be more akin to substantive rules. Considering the edge cases of "extreme procedural hurdles" ensures agencies are not regulating the primary conduct of private parties without public notice and comment.

To summarize, for a procedural rule to fit within the APA's exception to notice and comment requirements, it must regulate secondary conduct and not enshrine a substantive value judgment. Because all procedural rules have some impact on how rights are exercised, we no longer apply the type of sliding scale called for by the substantial impact test, which required courts to somehow assess the magnitude of effects on regulated parties of a rule of agency procedure. The extent of the impacts or burdens on primary rights does not provide the dividing line between substantive and procedural rules, although it may mark when a procedural rule has such extreme effects that it is properly considered substantive.

## III.

The 2019 Rule does not encode a substantive value judgment, and it governs only secondary conduct by establishing procedures for representation elections. The relevant primary conduct, namely the rights protected by the National Labor Relations Act, is employee representation for the purpose of collective bargaining, which must be determined in "an election by secret ballot." *See* 29 U.S.C. § 159(c)(1). These rights remain untouched by the Rule. The majority does not contest the Rule governs secondary conduct. Rather the majority simply applies the old standard and tries to gauge the extent of any impacts of these procedural choices on the rights of unions and employers.

Applying the correct standards, the critical fact for the challenged provisions in the 2019 Rule is that they do not change the "substantive standards" governing who wins and who loses elections, or who is part of the bargaining unit. *See Jem Broad.*, 22 F.3d at 327. The majority never claims they do. Instead, each provision changes the details of how an election is conducted. Any substantive effect is incidental. *See Bowen*,

834 F.2d at 1047. The effects of the rule are apparently minor, as the majority nowhere suggests that the procedures have grave or extreme impacts. The five provisions are properly classified as procedural, and therefore notice and comment was not required for any of them. I address each of the rules in turn.

## A.

*Pre-Election Litigation Timing*. Employers and unions may disagree about which employees are part of the bargaining unit and thus eligible to vote in any election. If such a dispute arises, the parties may resolve it by agreement or by adjudication in front of the Board. Under the 2014 Rule, the election would go forward, even if a dispute were still pending. 79 Fed. Reg. at 74,482. The 2019 Rule reverses the timing: "Disputes concerning unit scope, voter eligibility and supervisory status will normally be litigated and resolved by the Regional Director before an election is directed." 84 Fed. Reg. at 69,593. This is a classic procedural rule that favors finality over speed and reflects no substantive value judgments. The provision does not change whether the election will occur or who will win, only when and how the election happens. I agree that this is a procedural rule. Maj. Op. 37.

## B.

*Election Scheduling*. Once a regional director orders an election, it must be scheduled. The 2019 Rule requires that the election be scheduled on "the earliest date practicable" but "normally not … before the 20th business day after" an election is directed. 84 Fed. Reg. at 69,595. The 2014 Rule, on the other hand, required elections to be scheduled as early as practicable. 79 Fed. Reg. at 74,485. Such scheduling implicates no substantive value judgment, but rather promotes the procedural concern for finality, allowing the Board sufficient time to resolve eligibility disputes in advance. As with the provision

concerning pre-election litigation, this provision does not change whether the election will occur, only when. The 20-day provision is also procedural, as the majority concludes. Maj. Op. 41.

C.

*Voter List Timing*. Once an election has been directed, the employer must provide a list of all eligible voters to the union and the Board. This voter list contains names, job titles, and contact information to facilitate the union's campaign activities. Before 2014, employers had seven days to turn over the list. 84 Fed. Reg. at 69,527. The 2014 Rule reduced the time to two business days. *Id.* The 2019 Rule provides five business days. *Id.* at 69,526. The majority concludes the provision is substantive because it "'trenches on' the union's substantive interest in campaigning on equal footing." Maj. Op. 20. The majority, however, applies the wrong legal standard and therefore reaches the wrong legal conclusion.

To begin with, the rule is facially procedural because it does not "alter the substantive criteria" by which elections are won or lost. *See Glickman*, 229 F.3d at 281. Five business days for exchanging voter lists embodies no substantive value judgment and merely implements an established pre-election procedure. In moving from two to five days, the Board explained that "providing more time to produce the voter list will reduce the potential for inaccurate lists, as well as the litigation and additional party and Agency expenditures that may result therefrom."[2] 84 Fed. Reg. at 69,532. The rule serves

---

[2] The majority asserts five days is unreasonable because the Board in 2014 found two days a reasonable time frame for providing the voter lists. Maj. Op. 22. But what the Board thought reasonable at one time cannot serve as the perennial benchmark for what is reasonable in the future. Importantly, here the Board recognized that although

procedural concerns, like facilitating accurate lists, promoting agreement, and avoiding litigation. *Id.* at 69,532.

When a procedural rule concerns the timeframe for asserting substantive rights, "the proper question is whether the time allotted is so short as to foreclose effective opportunity to make one's case on the merits." *Lamoille Valley*, 711 F.2d at 328. An unusually short time frame could impose the type of "extreme procedural hurdle[]" that converts a procedural rule into a substantive one. *Id.* No extreme hurdle exists here. Moving from two business days to five, in a pre-election period that normally lasts a minimum of 20 business days, hardly forecloses a union's ability to campaign or imposes an extreme procedural hurdle. Rather it is the type of "incidental mechanical burden[] on regulated" parties that we have classified as procedural. *See Bowen*, 834 F.2d at 1051.

The majority does not identify any substantive value judgment encoded in the voter list provision. Nor does it suggest that the rule regulates primary conduct. Instead, the majority concludes the provision is substantive because the union has an "interest in campaigning on equal footing" and the voter list provision "necessarily burdens [that] interest." Maj. Op. 21. This analysis effectively returns to the obsolete "substantial impacts" test, here perhaps just an "impacts" test. *See* Maj. Op. 26 (expressing skepticism that three days "has *de minimis* impact") (cleaned up).

---

"technological changes … may permit some employers to more quickly compile and transmit the voter list," this was not true for all employers and additional challenges existed for "decentralized employers," the "construction industry," and "joint or multi-employer arrangements." 84 Fed. Reg. at 69,531–32. In light of that finding, the Board could reasonably adjust the timeline for providing voter lists.

On the majority's reasoning, election rules will rarely be procedural, and the Board has been acting improperly for decades.[3] The reality, of course, is that every election rule will have some impact on the parties to an election. The majority's reasoning is precisely that the *burden*, which looks a lot like a "substantial impact," makes the rule substantive. This runs contrary to this court's repeated recognition that all procedural rules place some burden on regulated parties and therefore that such burden alone does not make a rule substantive. *See, e.g.*, *Glickman*, 229 F.3d at 281 ("[A]n otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties.").

Two days is reasonable to wait for a voter list, but not five—what about three or four days? Judicial parsing of an agency's procedural choices has never been the standard for drawing a line between substantive and procedural rules. Under our precedents, in the absence of some showing that the five-day timeline effectively forecloses the union's rights, simply stating that the rule imposes some burdens does not make it a substantive rule.

D.

*Certification Timing*. The regional directors "shall certify the results" of representation elections. 29 U.S.C. § 159(c)(1);

---

[3] The majority also emphasizes the voter list "facilitates the transmission of information between parties," not just between one party and the Board. Maj. Op. 23. But a procedure governing conduct between parties with respect to an election supervised by the Board can be a procedural rule under section 553(b)(A), and I am aware of no case in which we have held that a rule of procedure becomes "substantive" simply because it governed the procedure between parties to an agency proceeding.

*see also id.* § 153(b). Under the 2014 Rule, certification proceeded regardless of whether a request for review of the election was pending before the Board. 79 Fed. Reg. at 74,487. Under the 2019 Rule, a regional director may certify election results only after Board review is complete. 84 Fed. Reg. at 69,526. Like the other provisions, the timing for certification governs the procedures of elections. It does not affect who wins or loses an election, and it does not change the substantive criteria for representation. *See Glickman*, 229 F.3d at 281.

Delaying certification until Board review is complete may affect the right to bargain because certification is the moment from which substantive legal rights attach. *See* 29 U.S.C. § 158(a)(5). The majority considers this "effect … on the right to collective bargaining" sufficient to make the certification timing a substantive rule. Maj. Op. 29 (discussing the Rule's "direct impact"). This again misstates the relevant standards, because we do not consider the "effect" or "direct impact" of procedural requirements to gauge whether they are a substantive regulation. Choosing to delay certification does not reflect a substantive value judgment. When the "timetable for asserting substantive rights" is at issue, "the proper question is whether the time allotted is so short as to foreclose effective opportunity to make one's case on the merits." *Lamoille Valley*, 711 F.2d at 328. Or put another way, agencies are allowed to "establish a terminal point" in procedural rules, even if the timing of substantive rights are affected. *See JEM Broad.*, 22 F.3d at 326. Only when a procedural timeline is "sufficiently grave" does it become a substantive rule.

The certification timing rule simply requires the regional director to wait for Board review before certifying the results of an election. The rule does not change whether certification will occur or whether employees will be represented. Instead, it sequences the Board and regional director's actions to

promote certainty and finality and avoid unnecessary litigation. The majority does not suggest the timeline here would have any grave impacts, perhaps because in practice the additional delay from the 2019 Rule ranges from minimal to nonexistent. To challenge an election in court, the employer must "refuse to bargain with the union certified by the Board" and wait for "an unfair labor practice complaint" to be filed. *Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 495 (D.C. Cir. 1980) (en banc). Yet, if the election is complete, the employer has a legal obligation to bargain. To mitigate this catch-22, regional directors "generally hold refusal-to-bargain charges in abeyance" pending an employer's challenge to the election.[4] 84 Fed. Reg. at 69,555. As a practical matter, this means the legal rights flowing from certification, namely rights to collective bargaining, are usually stayed, which for all intents and purposes is the same as staying certification. The 2019 Rule delays certification until after Board review, which has the same results as the 2014 Rule, but without "needless litigation." *Id*.

Numerous decisions of this circuit have recognized that rules adjusting the timing for exercising substantive rights are procedural. For instance, in *Public Citizen*, we addressed a State Department policy against searching for any FOIA documents produced after the date of the request. 276 F.3d at 637. The FOIA policy affected what documents would be produced. *See id.* We nonetheless found the so-called "cut-off policy" encoded "no substantive value judgment" because it applied equally to all FOIA requests. *Id.* at 641 (cleaned up). Therefore, we concluded the policy was a "prototypical

---

[4] The majority labels the practice of staying refusal-to-bargain charges as "underenforcement." Maj. Op. 27. But a stay is not underenforcement, just delayed enforcement, which is why this provision is procedural.

procedural rule properly promulgated without notice and comment." *Id.* Similarly, in *Lamoille Valley*, a rule shortened the timeline for railroads to respond to a proposed merger from 90 days to 60 days. 711 F.2d at 327. Because it was a procedural schedule that did not foreclose the effective opportunity to win on the merits, we upheld it as a procedural rule. *Id.* at 328. Finally, in *JEM Broadcasting*, we found a rule establishing a "fixed filing period" of 30 days for FM station license applications, with no opportunity to correct, was a "straightforward" procedural rule. 22 F.3d at 322, 326. Although the rule could be "described as affecting substance" and might even be "harsh" in some cases, it did not change the "*substantive standards* by which the FCC evaluate[d] license applications." *Id.* at 326–27 (cleaned up). This was fatal to the claim that the rule was substantive. The court concluded that establishing a cut-off date was part of a necessary and reasonable procedural rule. *Id.* at 327.

The majority fails to distinguish these cases. It makes a puzzling suggestion that there is a material difference between "asserting" and "exercising" substantive rights, such that the timing for asserting rights is procedural, but the timing for exercising rights is substantive. Maj. Op. 27–28. Yet the assertion and exercise of rights is invariably linked, and so it is unsurprising that the majority's distinction finds no support in the APA and has been rejected by our caselaw.

The majority's approach—labeling some rights substantive and important and others less so—will result in uncertainty and produces contradictory results even in this case. Delayed certification is supposedly substantive because it "directly alters an employer's legal duty and its employees' associated substantive right." Maj. Op. 40. On this reasoning, the rule that postpones an election for some 20 days would also be substantive because it necessarily postpones certification

and the attachment of the employer's legal duty. Yet the majority properly classifies the 20-day rule as procedural. Because both rules have some effects or impacts on the parties' rights, the majority's different treatment amounts to finding one provision has more substantial effects than the other, in contravention of our caselaw.

Most timelines for regulatory procedure have some impact on substantive rights, but without a showing that the timeline egregiously undermines those rights, we have accepted them as an ordinary and essential aspect of agency procedures. Like the 20-day rule, the certification timing provision is a reasonable procedural choice and notice and comment was not necessary.

E.

*Election Observer Qualifications*. From its earliest days, the Board has allowed parties to have observers at elections as a "courtesy" or "privilege." 84 Fed. Reg. at 69,551. The Board has held it is not an abuse of discretion to revoke this courtesy. *Id.* Although the Board generally lets the parties select their own observers, that practice is subject to limitations imposed by the regional directors or the Board. To make this process more transparent and efficient, the 2019 Rule provides that "whenever possible, a party shall select a current member of the voting unit as its observer, and when no such individual is available, a party should select a current nonsupervisory employee as its observer." *Id.* at 69,552.

This is a typical procedural rule. It streamlines a discretionary process the Board has created to improve the administration of elections. A rule is properly classified as procedural if it addresses secondary conduct. The procedural exception "covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves." *See JEM*

*Broad.*, 22 F.3d at 326 (quoting *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980)). The "rights or interests of parties" in this context means primary rights and interests, not an interest in a particular kind of procedure. *See id.* at 328. Because the election observer provision does not alter the scope of representation, it does not impose a new "substantive burden." Maj. Op. 33 (cleaned up).

The majority cannot label the election observer rule as substantive because the rule does not encode a substantive value judgment. The Board's judgment, to allow non-Board observers, is a procedural one. The wholly discretionary practice of allowing election observers helps "assure the parties and the employees that the election is being conducted fairly" and avoids the appearance of "partiality on the part of the Board." 84 Fed. Reg. at 69,551. The point is transparency in an election procedure under the control of the Board. This is not a "substantive value judgment" within the meaning of our cases. All actions are necessarily "based on the value judgment that the chosen option is better, in some relevant way." *Glickman*, 229 F.3d at 282. When that value judgment goes to procedural values, like ensuring agency operations are accurate, transparent, and efficient, the rule is properly procedural. *See JEM Broad.*, 22 F.3d at 328.

The majority also misidentifies the relevant substantive interest. The parties have no interest in election observers for their own sake. Observation is just one procedure that helps protect the right to collective bargaining. *See* 29 U.S.C. § 159(a). Such procedures are ordinarily not substantive, even though they may impact substantive rights. For instance, we have held that a rule requiring audits be performed by nonagency accountants was procedural because the substantive requirement of an audit was unchanged—the rule affected only the question of how to "satisfy the audit requirement."

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 665 (D.C. Cir. 1978) (cleaned up). Here, an election observer is like an auditor. A party might want a particular observer, but only because the observer helps it assert a substantive interest, not because the choice of observer changes that substantive interest.

The majority does not identify what effects the election observer rule will have on the outcome of elections. In fact, it is hard to imagine it will have any. The mere fact that the rule may have *some* impact on elections does not suffice to turn a facially procedural rule into a substantive one. Nor does the majority find, as it must, that the effects here are "sufficiently grave." *See Lamoille Valley* 711 F.2d at 328. The election observer rule is procedural and should be upheld.

\* \* \*

The 2019 Rule does not change the scope of collective bargaining or the standards by which those rights are reviewed; rather, it adjusts schedules, timelines, and monitoring mechanisms. Like all procedural rules, the challenged provisions may affect how parties exercise their rights, but nothing here imposes the type of extreme procedural hurdle that converts a facially procedural rule into a substantive one. Under this circuit's precedents, each of the provisions is properly classified as a procedural rule and therefore was permissibly promulgated without notice and comment.

## IV.

Before 2014, when a party sought review within 14 days of the direction of an election, all ballots were impounded and remained unopened pending review. 84 Fed. Reg. at 69,547. The 2014 Rule eliminated the impoundment provision. The 2019 Rule charts a middle course. Now if a party files for

review within ten days of the direction of an election, disputed ballots are segregated and impounded pending a decision of the Board. A request for review may be filed later than ten days, but ballots are not impounded. *Id.* at 69,526.

The parties agree the impoundment provision is procedural. The AFL-CIO argues it should be set aside on two grounds: (1) The provision is arbitrary and capricious because ballots are automatically impounded, even when review might be rendered moot by the election results; and (2) the provision is contrary to 29 U.S.C. § 153(b). The majority vacates the provision as contrary to law, but I would uphold it as consistent with the statute and reasonably explained.

## A.

Section 153(b) allows the Board to delegate its power to direct and certify elections, except that "the Board may review any action of a regional director." 29 U.S.C. § 153(b). But "such a review shall not, *unless specifically ordered by the Board*, operate as a stay of any action taken by the regional director." *Id.* (emphasis added). To determine whether the impoundment provision is consistent with section 153(b) requires a two-part inquiry. First, is impoundment a stay? If not, there is no section 153(b) violation. Second, if impoundment is a stay, was it specifically ordered by the Board? If it was so ordered, there is no section 153(b) violation.

The impoundment provision is clearly a stay, as the majority agrees. "Stay" is defined as the "[t]he postponement or halting of a proceeding, judgment, or the like." BLACK'S LAW DICTIONARY 1639 (10th ed. 2014). Impoundment, the Board admits, "postpones" the tallying of ballots. 84 Fed. Reg. at 69,548. Counting ballots is an "action" a regional director may take as part of his delegated authority to "direct an election" and "certify the results thereof." 29 U.S.C. § 153(b).

Therefore, counting is a statutory "action" of the director, and impoundment stays that action.[5]

The plain language of the statute is reinforced by the impoundment provision in the 2019 Rule:

> The filing of such a request shall not, unless otherwise ordered by the Board, operate as a stay of the election …, *except* that if a request for review of a decision and direction of election is filed within 10 business days …, ballots whose validity might be affected by the Board's ruling … shall be impounded and remain unopened pending such ruling or decision.

29 C.F.R. § 102.67(c) (emphasis added); *see also id.* § 102.67(h) ("The grant of a request for review shall not, *outside* [29 C.F.R. § 102.67(c)], stay the Regional Director's action.") (emphasis added). Because impoundment is an *exception* to the rule that review does not operate as a stay, the Rule clearly specifies that impoundment will act as a stay.

Next, we must consider whether the impoundment provision in the 2019 Rule was "specifically ordered by the

---

[5] The Board argues that "taken" can mean actions in the past, present, or future because "taken" is a participial adjective modifying the noun "action." In isolation, a past participle has no temporal limitation and may refer, as the Board suggests, to past, present, or future action. When, however, a participle is postpositive, i.e., appearing after the noun, it is timeless. In section 153(b), context and placement of the participle clarify its temporal reach. The participle "taken" appears after the noun it modifies: "any action taken by the regional director." That means it applies to past, present, and future actions. Because impoundment is an "action taken" by the director, it fits within section 153(b).

Board." 29 U.S.C. § 153(b). By promulgating a rule that provides conditions for when the impoundment will occur, the Board has specifically ordered a stay. The Board has discretion to delegate its power to direct and certify elections, and it retains the authority to review or withdraw that delegated power. While section 153(b) ensures that review by the Board will not operate as an implicit stay, the Board may stay the actions of a regional director at will. Nothing in the statute forecloses the Board from enacting a rule that establishes prospective criteria for when the actions will be stayed. Indeed, such rulemaking has the advantage of providing notice and predictability to parties. The impoundment provision was a specific order to issue stays in certain conditions.

The majority maintains that a stay may be ordered only "in a particular case." Maj. Op. 46. Of course, the Board may order a stay in a particular case, but nothing in section 153(b) precludes the Board from ordering a stay through rulemaking. Section 153(b) simply states: "such a review shall not, unless specifically ordered by the Board, operate as a stay." The clause "unless specifically ordered by the Board" is not explicitly limited to reviews in a particular case, and so the Board may order a stay in a particular case, or it may issue an order through prospective rules. Section 153(b) does not constrain the Board's choice.

The impoundment provision of the 2019 Rule is a stay specifically ordered by the Board and therefore is consistent with section 153(b).

B.

As I conclude the impoundment provision is consistent with the statute, I must address the AFL-CIO's argument that the provision is arbitrary and capricious because it creates uncertainty in the time between election and certification and

forces the Board to decide issues that may be moot. Under arbitrary and capricious review we consider whether the agency's decision is "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). The court should not substitute its policy judgments for that of the agency. Instead, we ask whether the agency has "considered the relevant issues" and adequately "explained the decision." *Id.* Here, we must recognize that "control of the election proceeding, and the determination of the steps necessary to conduct that election fairly were matters which Congress entrusted to the Board alone." *NLRB v. Waterman S.S. Corp.*, 309 U.S. 206, 226 (1940).

In the 2019 Rule, the Board explained the impoundment provision will promote finality and certainty by preventing an immediate tally of the ballots from being invalidated after Board review. 84 Fed. Reg. at 69,548. It also noted a general rule will promote transparency and uniformity because all requests for review within ten days will stay the election pending review. *Id.* Finally, the Board noted that impoundment promotes ballot secrecy by hiding the sentiments of employees whose votes might be nullified upon future review. *Id.* These reasons comport with the Board's responsibility for ensuring the efficient administration of fair elections and were reasonably explained.

The AFL-CIO's concern—that the Board will conduct reviews that will be rendered moot by the election—was addressed by the Board. The Board recognized that impoundment comes with some cost to "promptness and efficiency," but concluded such concerns were outweighed by the gains in finality, transparency, uniformity, and secrecy. 84 Fed. Reg. at 69,548. It was reasonable to conclude these gains also outweighed any concerns that employers would be unsure how to act after an election, but before results are tallied. With

the 2014 Rule, that uncertainty simply existed at a different time: after certification, but before the end of the review process. *Id.* at 69,555 ("[W]here a certification issues notwithstanding the (potential) pendency of a request for review that may nullify the certification, the possibility for confusion is greatly amplified.").

The AFL-CIO may prefer a different procedure, but that does not render the Board's judgment unreasonable. These procedural judgments are well within the Board's statutory authority to manage elections. Therefore, the impoundment provision is not arbitrary or capricious.

\* \* \*

I concur in the judgment with respect to our jurisdiction and the holding that the Board's 2019 Rule is not arbitrary and capricious. I part ways with the majority because I would hold the Rule's impoundment provision is consistent with law and reasonably explained and that all five challenged provisions of the 2019 Rule are procedural.

The administrative law distinctions relevant to determining whether the Rule survives challenge are admittedly in the weeds. The APA requires notice and comment for substantive rules, but explicitly exempts procedural rules from these requirements. Drawing the proper line between procedural and substantive rules has important consequences, both to ensure that courts do not layer additional requirements on an agency's procedural rules and also to ensure that agencies follow the requirements of notice and comment when imposing substantive value judgments against regulated parties. The majority distinguishes substantive from procedural rules by analyzing the extent of the burden on regulated parties—but such weighing of impacts is not what the APA requires and has been decisively rejected by this court.

The majority emphasizes the importance of the Board's election procedures to collective bargaining rights. It is true that agency procedures are often consequential and impact parties' rights. Nonetheless, our cases maintain that only rules regulating primary conduct or those with particularly grave effects are substantive, and the rules here are neither.

Applying our circuit's precedents, the 2019 Rule is procedural and therefore no notice and comment was necessary. Because I would uphold the 2019 Rule in full, I respectfully dissent in part.